412 A.2d 860

John S. CHMILL, David Hirosky, John G. Holtz, Thomas Pflum, David J. Puciata, Lawrence T. Yakich and
Paul R. Myers,

v.

CITY OF PITTSBURGH, Pittsburgh Civil Service Commission
and Stephen A. Glickman, Appellants.

Supreme Court of Pennsylvania.

Argued March 6, 1979.

Decided March 20, 1980.

Mead J. Mulvihill, Jr., City Sol., Robert B. Smith, Asst. City Sol., Pittsburgh, for appellants.

Sanford A. Segal, Christopher Lepore, Gatz, Cohen, Segal & Koerner, M. J. McCaney, Jr., Pittsburgh, for appellees.

Robert S. Mirin, Harrisburg, Marc Kranson, Washington, D.C., John E. Benjes, Harrisburg, for appellant-intervenor Pa. Human Relations Com.

Patricia G. Miller, Asst. Atty. Gen., Michael Louik, Deputy Atty. Gen., Pittsburgh, for appellant-intervenor Com. of Pa.

Myrna P. Field, Mid-Atlantic Legal Foundation, Philadelphia, for amicus curiae.

## OPINION OF THE COURT

ROBERTS, Justice.

This case presents the question of whether a municipal employer which has been found guilty of racial discrimination by a federal court may institute temporary remedial race-conscious hiring. Plaintiffs, white applicants for jobs as firefighters in the City of Pittsburgh, challenge the Pittsburgh Civil Service Commission's proposed use of race-conscious hiring procedures to correct racial discrimination in the Pittsburgh Bureau of Fire. Claiming they would have been hired but for the challenged procedures, these plaintiffs took statutory appeals from the Commission's proposal and also sought injunctive relief. These actions were consolidated before the Court of Common Pleas of Allegheny County which, after a hearing, denied all claims. On appeal a divided Commonwealth Court reversed, holding that the Commission's action was not authorized by federal employment discrimination law and violated state employment discrimination law, state civil service law and the equal protection clause of the United States Constitution.

We granted allowance of appeal to consider these important issues. Given the predicate of a federal judicial finding of discrimination as well as the important interests of federal-state comity and voluntary compliance with federal and state employment standards, we hold the use of race-conscious hiring is permissible in this case. Accordingly, we reverse the order of the Commonwealth Court and reinstate the order and decree of the court of common pleas.

## I

In an important sense this case began in the federal courts. In 1974 the United States District Court for the Western District of Pennsylvania found that the Pittsburgh Bureau of Fire and the Pittsburgh Civil Service Commission had been discriminating in hiring against blacks in violation of federal law. *Commonwealth of Pennsylvania v. Glickman,* 370 F.Supp. 724 (W.D.Pa.1974).[1] The lawsuit was brought by the Commonwealth of Pennsylvania and by the certified class of "all black persons who presently have applications pending for the position of firefighter with the City of Pittsburgh Bureau of Fire, as well as all black persons who may apply for said position at any time in the future." Among the named defendants were the members of the Pittsburgh Civil Service Commission. The Commission is charged by state law with the obligation to test and certify to the City all candidates for firefighter. See Act of June 27, 1939, P.L. 1207, § 1, as amended, 53 P.S. § 23491 (Supp.1979). The plaintiffs claimed that the City's hiring practices, based on the Commission's testing procedures, were illegally discriminatory and sought an injunction against future discrimination. Plaintiffs alleged a history of

1. The basis of federal liability was 42 U.S.C.A. § 1981, which provides that:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

minority under-representation in the Pittsburgh firefighting force, including a prior history of intentional limitation on the number of black firefighters. The plaintiffs also specifically attacked the Commission's 1972 testing procedures, claiming that the tests had an unjustifiable racially disproportionate impact.

Testimony in the federal district court reviewed in detail hiring practices in the Bureau of Fire from the 1930's onward. Undisputed evidence from Bureau officials, for example, described hiring practices from the 1930's through the 1950's when the City maintained two segregated black firehouses. This testimony acknowledged the existence of a patronage hiring system which, even long after the demise of the "separate but equal" doctrine continued to place a fixed limit on the number of jobs available to blacks. As a result of this and other practices the district court found that

"in 1950, when Pittsburgh's total population was approximately 675,000, 12% of its citizens and roughly 3% of its firefighters were black. In 1960, about 16% of the city's population and 3% of its firefighters were black. In 1973, the black percentage of the city's population had risen to 20%, and yet still only 3.9% of its firefighters were black."

370 F.Supp. at 730 (footnote omitted).

The district court next considered the results of the Commission's 1972 eligibility test, which included a written examination. The court found that 70% of the white applicants taking the written examination passed, while only 45.2% of the black applicants passed. On the basis of these test results and the past and current disparity between the percentage of black firefighters and the percentage of blacks in the city, the court found a prima facie case of racial discrimination. 370 F.Supp. at 730.[2] The court then placed the burden on the Commission to establish that its

2. The district court expressly found it unnecessary to consider other eligibility requirements imposed by the Civil Service Commission, such as the requirement of a high school or equivalent degree, which the plaintiffs also challenged as discriminatory. 370 F.Supp. at 730 n. 6.

hiring practices were related to job performance. Because the Commission was unable to make such a showing, the district court found the Commission in violation of federal law.

As part of its remedial order, the district court directed the Civil Service Commission either to show the validity of its 1972 tests or to formulate a new job-related testing procedure. The court further ordered the Commission to take all necessary steps to recruit blacks to take whatever test the Commission ultimately devised. The court acknowledged the possibility of ordering racially-oriented hiring as a remedy for the found discrimination, but refrained from doing so. The court was obviously impressed by the good faith of the City officials and, in substantial part, refrained from ordering quota hiring because of its trust that the defendants would remedy the problem themselves. The court stated that "in the final analysis, responsibility for eradicating racial discrimination in the Pittsburgh Bureau of Fire rests upon the defendants alone." 370 F.Supp. at 736. Nevertheless, as a final note the court admonished: "It must, however, be made clear that the fact that at this stage of the proceedings the Court has rejected the option of imposing a racial hiring quota does not mean that it is foreclosed from instituting such a remedy in the future." Id. at 737.

As a result of the federal court's decision, the Commission abandoned its prior testing procedures. In June of 1974 the Commission administered a new hiring examination, comprised entirely of physical agility tests. The eligibility list based on the results of these tests remained in force through September 1975. Of the 163 firefighters hired during that time, 21 were members of minority groups. No challenge is made to that test or to any hiring based on it.

The present controversy concerns the examination subsequently administered by the Commission in August 1975. The 1975 examination, like that in 1974, tested only physical agility. It consisted of five or six separate events including a shuttle-run, hose-coupling and climbing. This examination

had been used in other cities, including San Francisco, where it had been shown reliable in predicting minimum qualifications for firefighters. And the Commission, likewise, had previously found the examination to be a reliable test of minimum job qualification. Record at 83a.

As usually administered, the passing score on the examination, indicating minimal qualification, is 75. The test does not, however, predict differences in ability or qualification between those who pass with a score of 75 and those whose scores are higher. Record at 84a, 93a.

As required by the district court, the Commission conducted an extensive campaign to notify minority groups about the up-coming test. Approximately 1500 applicants took the examination, 522 of whom were minorities. Over 1160 applicants passed, approximately 360 of whom were minorities.

Although minorities passed the 1975 test in roughly the same percentage as whites, minorities did not place in substantial numbers at the top of the list. Thus, in March 1976, when the City requested the Commission to certify twenty candidates for new openings for firefighters, only three of those among the first twenty on the testing list were minorities. At that time, however, still only 55 members or 5% of the 1047 person Fire Bureau were black. Thus, although the black population of Pittsburgh had risen to 22%, the increase in black representation in the Fire Bureau had increased only one percent since the federal court's decision in *Commonwealth of Pennsylvania v. Glickman.*

Mindful of its existing obligation to comply with the federal court order to remedy the found racial discrimination, aware of its failure, despite good faith efforts, to alleviate in any significant way the existing racial imbalances in the Fire Bureau, and concerned over possible challenges to the use of test scores which, over the passing score of 75, could not be shown to be job-related, the Commission unanimously voted to certify ten white applicants and ten

minority applicants.[3] Both groups were selected on the basis of their scores on the agility examination. The Commission took this action, in addition, in light of the mandatory racial hiring quotas that had then recently been imposed upon it by the federal court to correct proven discrimination in the Pittsburgh Police Department. See *Commonwealth of Pennsylvania v. Flaherty,* 404 F.Supp. 1022 (W.D.Pa.1975).

This dual certification procedure is the focus of the present controversy. Plaintiffs are the white applicants who ranked between 15 and 21 on the single test list derived from the 1975 examination. They claim they would have been certified but for the Commission's decision.[4] Plaintiffs contend that the Commission's action violates (1) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e et seq.; (2) the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, § 1 et seq., as amended, 43 P.S. § 951 et seq. (1964 & Supp.1979); (3) the Second Class Cities Firemen's Civil Service Act, Act of June 27, 1939, P.L. 1207, § 1 et seq., as amended by the Act of July 3, 1963, P.L. 186, § 1 et seq., 53 P.S. § 23491 et seq. (1957 & Supp.1979); and (4) the equal protection clause of the fourteenth amendment to the United States Constitution.

Plaintiffs presented their claims at a hearing before the Civil Service Commission, but were denied relief. Plaintiffs then took statutory appeals from that decision to the Court of Common Pleas of Allegheny County. See 53 P.S. § 23493.3. At the same time plaintiffs sought an injunction against the City of Pittsburgh and the Commission prohibit-

3. The record indicates that one of the ten minority applicants the Commission sought to certify was a woman, apparently because of the Commission's desire to remedy prior sex discrimination in the Bureau of Fire. Record at 87a; see id. at 101a. Plaintiffs have never challenged the propriety of this action.

4. Although the plaintiffs were not foreclosed from consideration for at least ten spaces and although they would, under state law, remain eligible for later certification, see 53 P.S. § 23453, they were denied the opportunity to compete for all twenty spaces, an injury in fact which gives them standing to maintain this action. *Regents of University of California v. Bakke,* 438 U.S. 265, 279–80 n. 14, 98 S.Ct. 2733, 2743, 157 L.Ed.2d 750 (Opinion of Powell, J.); see *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

ing them from appointing candidates in the proposed manner and requiring the Commission either to maintain plaintiffs' eligibility during the determination of their statutory appeals or to certify them immediately to the City.[5]

In the court of common pleas the State Conference N.A.A. C.P., the International Association of Black Professional Firefighters and a number of named individuals were permitted to intervene as defendants. The named individuals are apparently those minority members who would be certified or otherwise affected by the Commission's proposed action. The court of common pleas conducted a hearing at which the sole witness was the Secretary and Chief Examiner of the Pittsburgh Civil Service Commission. By written opinion, the trial court denied the statutory appeal and dismissed the request for injunctive relief.

Plaintiffs appealed to the Commonwealth Court which stayed the trial court's order and decree pending appellate review. The Commonwealth Court, two judges dissenting, reversed the court of common pleas, ruling that the Commission's action was not authorized by Title VII and was prohibited by the Pennsylvania Human Relations Act, the Firemen's Civil Service Act and the equal protection clause. 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977). The City and the Commission sought allowance of appeal to this Court. Both the Commonwealth of Pennsylvania and the Pennsylvania Human Relations Commission sought leave to intervene and allowance of appeal. This Court granted all petitions.[6]

II

Appellees contend that the Commission's proposed certification plan violates Title VII of the Civil Rights Act of 1964,

5. At this stage, the City and the Commission petitioned for removal to the United States District Court for the Western District of Pennsylvania based on 28 U.S.C.A. § 1443(2). Because the district court found that the action did not satisfy the statutory requirements for removal, the petition was denied on April 29, 1976.

6. By leave of court, the American Civil Liberties Union of Pittsburgh and the Mid-Atlantic Legal Foundation have filed briefs amici curiae. This case was reassigned to this writer on November 9, 1979.

as amended, 42 U.S.C.A. § 2000e et seq.[7] Section 2000e–2(a)(1) of the Act provides:

"(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions,

**7.** We note that the federal court in this case found the Commission in violation of 42 U.S.C.A. § 1981, and not Title VII. See n. 1, supra. But in proceeding under § 1981 the district court expressly imposed upon the Commission the identical obligations usually required under Title VII. 370 F.Supp. at 732 n. 8. Thus the Commission was required to defend the disproportionate racial impact of its 1972 testing procedures by meeting the job-relatedness standard announced by *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Moreover, before the federal action in this case began, Title VII was amended to include public employers such as the Commission. Equal Employment Opportunity Act of 1972, Pub.L. 92–261, 86 Stat. 103 (effective March 24, 1972), 42 U.S.C.A. § 2000e(a). And it is now established that the *Griggs* standard must be met by public employers covered by Title VII. *Dothard v. Rawlinson,* 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); see *Scott v. City of Anniston,* 597 F.2d 897 (5th Cir. 1979); *Blake v. City of Los Angeles,* 595 F.2d 1367 (9th Cir. 1979); *United States v. City of Chicago,* 573 F.2d 416 (7th Cir. 1977), cert. denied sub nom. *Isakson v. United States,* 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); see also *Firefighters Institute for Racial Equality v. City of St. Louis,* 549 F.2d 506 (8th Cir.), cert. denied sub nom. *United States v. Banta,* 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977).

Appellees do not dispute that the Commission's 1972 examination, challenged in the district court, may at that time have been equally vulnerable under Title VII. More importantly, any challenge the Commission feared would result from the certification of only three blacks out of twenty candidates in 1976 would certainly have been cognizable under Title VII. Appellees do not claim that because the Commission was found liable under § 1981 rather than under Title VII that Title VII therefore presents any different bar to voluntary remedial action in response to the found violation. We note that, as under Title VII, the federal courts have not hesitated to order race-conscious remedies under § 1981. See e. g., *Bridgeport Guardians, Inc. v. Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Carter v. Gallagher,* 452 F.2d 315 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); see also *Davis v. County of Los Angeles,* 566 F.2d 1334 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).

or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Appellees do not challenge the validity of the federal court finding of discrimination in *Commonwealth of Pennsylvania v. Glickman.* Nor do appellees challenge the power of a federal court to order race-conscious relief as a remedy for a violation of Title VII or other federal fair employment laws. 42 U.S.C.A. § 2000e–5(g); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); see *Regents of University of California v. Bakke,* 438 U.S. 265, 300–301, 98 S.Ct. 2733, 2754–55, 57 L.Ed.2d 750 (1978) (Opinion of Powell, J.); id. at 290 n.28, 98 S.Ct. at 2781 (Opinion of Brennan, J., joined by White, Marshall and Blackmun, JJ.). As the Supreme Court has emphasized:

"[w]here racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' "

*Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) quoting *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). Indeed, the federal courts of appeals have consistently upheld race-conscious hiring as a remedy for violations of Title VII. See e. g., *United States v. City of Chicago,* 549 F.2d 415, 436–37 (7th Cir. 1977), cert. denied sub nom. *Isakson v. United States,* 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); *United States v. International Union of Elevator Constructors,* 538 F.2d 1012 (3rd Cir. 1976); *Boston Chapter N.A.A.C.P. Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974); *Rios v. Enterprise Ass'n Steamfitters, Local 638,* 501 F.2d 622 (2d Cir. 1974); *United States v. N. L. Industries, Inc.,* 479 F.2d 354 (8th Cir. 1973); *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. International Brotherhood of Electrical Workers, Local 38,* 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Local 53, International Ass'n of*

*Heat & Frost Insulators & Asbestos Workers v. Volger,* 407 F.2d 1047 (5th Cir. 1969); see *Patterson v. American Tobacco Co.,* 535 F.2d 257, 274 (4th Cir. 1976). Several such orders have been directed at public employers in this Commonwealth, see e. g., *Erie Human Relations Commission v. Tullio,* 493 F.2d 371 (3rd Cir. 1974), including the Pittsburgh Civil Service Commission, *Commonwealth of Pennsylvania v. Flaherty,* 404 F.Supp. 1022 (W.D.Pa.1975) (Pittsburgh Police Department).[8] And, indeed, it has been held reversible error for a district court to withhold quota relief when other forms of relief failed to eliminate racially discriminatory practices or effects. See e. g., *Morrow v. Crisler,* 491 F.2d 1053 (5th Cir.) (en banc), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). Important to the question of voluntary compliance, the federal courts, including the Third Circuit Court of Appeals, have also upheld the validity of race-conscious hiring programs incorporated in consent decrees between parties. See e. g., *E.E.O.C. v. American Tel. & Tel. Co.,* 556 F.2d 167 (3rd Cir. 1977), cert. denied sub nom. *Communications Workers of America v. E.E.O.C.,* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); see also, *Oburn v. Shapp,* 521 F.2d 142 (3rd Cir. 1975) (denying preliminary injunction against race-conscious hiring plan included in consent decree involving Pennsylvania State Police).

**8.** When Title VII was amended in 1972 to cover public employment, see n.7, supra, certain of the federal courts of appeals' decisions ordering race-conscious hiring preferences in the area of private employment were expressly reviewed. See Legislative History of the Equal Employment Opportunity Act of 1972 at 1048–1070. In both Houses of Congress attempts to prohibit court-ordered quota relief were rejected. Id. at 1074 (Senate); id. at 207–261 (House). And the section-by-section analysis accompanying the new legislation, prepared by the Senate Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, states:

"In any area where the new law does not address itself, or in any areas where a specific contrary intent is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII."

Id. at 1844. There is no doubt that Congress meant to permit the continued availability of court-ordered racial hiring preferences. Nothing in the legislative history of the Act suggests that, for this purpose, public employment was to be treated any differently.

█ Nevertheless, appellees insist that Title VII prohibits the Commission from adopting any form of voluntary racial preference in hiring. On this issue we have significant guidance from the United States Supreme Court's recent decision in *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). We believe that *Weber* and the policy considerations underlying it compel the conclusion that Title VII does not prohibit the Commission's action.

*Weber* concerned the legality under Title VII of an affirmative action craft-training program established by employer-union collective bargaining. In order to alleviate racial imbalances in its craft work force, Kaiser Aluminum instituted a plan to select at least 50% black trainees to fill craft openings in its plants until such time as the percentage of black skilled craft workers approximated the percentage of blacks in the local labor force. White employees with more seniority who were excluded from the program because of the 50% requirement brought suit. The Supreme Court, ruling that Title VII does not prohibit all voluntary affirmative action, upheld the employer's craft-training program.

The Supreme Court noted that "Congress' primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was with 'the plight of the Negro in our economy.'" 443 U.S. at 202, 99 S.Ct. at 2727 (citation omitted). The Court explained that examination of the legislative history of the Act

"makes clear that an interpretation of the [Act] that forbade all race-conscious affirmative action would 'bring about an end completely at variance with the purpose of the statute' and must be rejected."

Id. Accordingly, the Court dismissed the argument that Title VII prohibits appropriate voluntary race-conscious action.[9]

---

**9.** Appellees place special reliance on section 703(j) of the Act, 42 U.S.C.A. § 2000e–2(j), which provides:

Because the Court found the Kaiser plan clearly accepta-
ble it did not detail the "line of demarcation between
permissible and impermissible affirmative action plans."
But in upholding the Kaiser scheme the Court looked to
three elements: the plan's purpose, its effect on the inter-
ests of non-minority employees and its duration. First, the
Court found that the purposes of the Kaiser plan "mirrored
those of the statute" because, like Title VII, the plan was
"designed to break down old patterns of racial discrimina-
tion and hierarchy," and "to 'open employment opportunities
. . . traditionally closed . . ..' " Id. at 208, 99
S.Ct. at 2730. Second, the plan "[did] not unnecessarily
trammel the interests of the white employees," id., since it
did not call for their discharge or replacement and since
whites were to comprise half of those trained. Finally, the
plan was a temporary one, designed to eliminate existing
racial imbalances, rather than maintain racial balance.

Significantly, the Court permitted the voluntary affirma-
tive action plan on the broad ground that it was a reasona-

"(j) Nothing contained in this subchapter shall be interpreted to
require any employer, employment agency, labor organization, or
joint labor-management committee subject to this subchapter to
grant preferential treatment to any individual or to any group
because of the race, color, religion, sex, or national origin of such
individual or group on account of an imbalance which may exist
with respect to the total number or percentage of persons of any
race, color, religion, sex, or national origin employed by any em-
ployer, referred or classified for employment by any employment
agency or labor organization, admitted to membership or classified
by any labor organization, or admitted to, or employed in, any
apprenticeship or other training program, in comparison with the
total number or percentage of persons of such race, color, religion,
sex, or national origin in any community, State, section, or other
area, or in the available work force in any community, State,
section, or other area."

Weber, however, expressly rejected appellees' interpretation of this
section. The Court held that the section insures only that employers
are not required to institute quota hiring merely because of existing
racial imbalances in their work force, but does not prohibit employ-
ers from doing so:

"The section does not state that 'nothing in Title VII shall be
interpreted to permit' voluntary affirmative efforts to correct ra-
cial imbalances. The natural inference is that Congress chose not
to forbid all voluntary race-conscious affirmative action."

Id. at 206, 99 S.Ct. at 2729.

ble response to employment conditions which had been "traditionally segregated." Id. at 209, 99 S.Ct. at 2730. Kaiser had never been found guilty of any employment discrimination, nor had it admitted any liability during the course of the *Weber* litigation. It was sufficient that the Supreme Court could take judicial notice of prior racial discrimination in craft employment generally, id. at 198 n.1, 99 S.Ct. 2725, and of the disproportionately low black craft force in Kaiser's plant. The Court thus permitted employers voluntarily to adopt racial hiring preferences without regard to whether they were presently discriminating or had previously engaged in prohibited race discrimination. Id. at 227, 228 n.8, n.9, 99 S.Ct. at 2730; id. at 212, 99 S.Ct. at 2732 (Blackmun, J., concurring).

█ Without question, the Commission's plan passes muster under these standards. First, there is no dispute that the Commission's action was taken in good faith to correct a history of substantial intentional discrimination in the Bureau of Fire. The Commission's plan is plainly intended to fulfill "the central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered through past discrimination." *Franks*, supra, at 771, 96 S.Ct. at 1267, quoting *Albemarle Paper Co.*, supra, 422 U.S. at 421, 95 S.Ct. at 2373.[10] Second, the means adopted to correct the existing effects of discrimination are not unduly broad. Indeed, the record establishes that the Commission's action was a necessary step toward eliminat-

10. There is no necessity to demonstrate, however, that each individual benefited by remedial action was himself an actual victim of the prior discrimination. We agree with the view expressed by four Justices in *Regents of University of California v. Bakke*, 438 U.S. 265, 363, 98 S.Ct. 2733, 2786, 57 L.Ed.2d 750 (Brennan, J., joined by White, Marshall and Blackmun, JJ.), that "it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination. See [*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 357, 97 S.Ct. 1843, 1865–1868, 52 L.Ed.2d 396.]" We note that the certified class of plaintiffs in the initial federal court action in *Commonwealth of Pennsylvania v. Glickman* included "all black persons who may apply for [positions as firefighters] at any time in the future." 370 F.Supp. at 727.

ing the disproportionately low minority representation in the Fire Bureau in the foreseeable future. Like the Kaiser plan, the Commission's action does not eliminate all whites from job competition and it does not deny to any person a job previously held or a benefit previously promised. The plan does not affect any existing employment rights. See 42 U.S.C.A. § 2000e–2(h); compare *Franks*, supra (permitting remedial award of retroactive seniority) with *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (prohibiting remedial order, based on pre-Act discrimination, disturbing bona fide seniority rights). Finally, as the trial court found, the Commission's action was temporary and intended only to correct existing substantial racial disparity. ·

*Weber*, nevertheless, involved a private employer and concerned the scope of private employment discretion under Title VII. This case involves public employment, covered by Title VII since its amendment in 1972. Equal Employment Opportunity Act of 1972, Pub.L. 92–261, 86 Stat. 103.[11] In the short time since *Weber* one federal court of appeals, however, has been presented with this situation. In a case similar to this one, the Sixth Circuit approved the Detroit Police Department's adoption of a voluntary affirmative action plan for the promotion of officers within the force. *Detroit Police Officers' Association v. Young*, 608 F.2d 671 (6th Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3466 (Jan. 10, 1980) (No. 79–1080). The Court relied upon *Weber* without qualification, stating that: "The test under Title VII of voluntary affirmative action is whether the action is consistent with the anti-discrimination policy of the statute." 608 F.2d at 689. The Court found the 50% minority promo-

---

11. Appellees' argument, advanced prior to *Weber*, is that Title VII prohibits all voluntary affirmative action. In light of *Weber*, appellees' absolute approach is obviously erroneous. Appellees, however, draw no distinction between public and private employers.

tion program established by the police department reasonable and upheld the city's action. Id. at 696.

A similar view of Title VII has been adopted by the Washington Supreme Court in response to challenges to voluntary racially-based hiring practices in the Seattle Fire Department. *Maehren v. City of Seattle,* 92 Wash.2d 480, 599 P.2d 1255 (1979), petition for cert. filed, 48 U.S.L.W. 3453 (Jan. 5, 1980) (No. 79–1061). And, most recently, California has reached the same conclusion. In *Price v. Civil Service Commission of Sacramento County,* 26 Cal.3d 257, 161 Cal.Rptr. 475, 604 P.2d 1365 (1980), the California Supreme Court rejected statutory and constitutional challenges to a voluntary racially-based hiring plan adopted by a public employer to correct existing racial discrimination. The California Court specifically denied any distinction between public and private employers for purposes of affirmative action under Title VII, Id., at 273–274 n.12, 161 Cal.Rptr. at 485, 604 P.2d at 1374 and, relying on *Weber,* approved a civil service commission order that one out of every three persons hired by a county prosecutor's office be a minority group member.

These unified readings of Title VII are persuasive. Moreover, they are consistent with the evident intention of Congress, which expanded Title VII coverage to public employment for the very purpose of providing state employees with the same protection afforded those already under the Act. *Dothard v. Rawlinson,* 433 U.S. 321, 331 n.14, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); see S.Rep.No.415, 92d Cong. 1st Sess., reprinted in Legislative History of the Equal Employment Opportunity Act of 1972 at 410, 418–20; H.R.Rep.No. 238, 92d Cong. 2d Sess., reprinted in [1972] U.S.Code Cong. & Admin.News at 2137, 2152–54.

Nevertheless, we need not decide this important federal issue here since we believe that the Commission's action is permissible even assuming a more stringent standard of

justification than that adopted in *Weber*. In this case we are not limited to taking judicial notice of historic discrimination in municipal fire departments.[12] Nor are we asked to review merely the Commission's own claim of a pattern of prior discrimination. Rather, we have here the important predicate of a previous federal judicial finding of discrimination by the Commission, relating to the very practices the Commission now seeks to remedy. In addition we have the common pleas court's findings, fully supported by the record and uncontested by appellees, that the Commission action was taken as a necessary practical response to the existing federal judicial mandate to correct the found racial discrimination. Viewed in this light, we find the justification for the Commission's action compelling.

Appellees insist, nevertheless, that Title VII prohibits the Commission from adopting this remedy voluntarily. We do not accept this view. Rather, we believe such a prohibition on voluntary compliance with the Act to be irreconcilable with the fundamentally conciliatory nature of the federal statute. As the Supreme Court has previously indicated: "[C]ooperation and voluntary compliance were selected as the preferred means for achieving [the goals of Title VII]." *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). See *Regents of*

12. We note, however, that a substantial number of decisions have found racial discrimination in municipal fire departments. See e. g., *Association Against Discrimination v. City of Bridgeport*, 594 F.2d 306 (2d Cir. 1979); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977), cert. denied sub nom. *Isakson v. United States*, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); *Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506 (8th Cir.), cert. denied sub nom. *United States v. Banta*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); *Boston Chapter N.A.A.C.P. Inc. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974); *Vulcan Society v. Civil Service Commission*, 490 F.2d 387 (2d Cir. 1973); *Carter v. Gallagher*, 452 F.2d 315 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Drayton v. City of St. Petersburg*, 477 F.Supp. 846 (M.D.Fla.1979); see also *Davis v. County of Los Angeles*, 566 F.2d 1334 (9th Cir. 1977), vacated as moot, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).

*University of California v. Bakke*, 438 U.S. 265, 365 n.38, 98 S.Ct. 2733, 2787, 57 L.Ed.2d 750 (1978) (opinion of Brennan, J., joined by White, Marshall and Blackmun, JJ.). This is clearly consistent with the well-accepted view that voluntary compliance with legal requirements is generally preferable.

> "[O]ur society and jurisprudence have always stressed the value of voluntary efforts to further the objectives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action."

Id. at 364, 98 S.Ct. at 2786–87.

In addition, any such restraint on voluntary compliance would create severe difficulties in the practical administration of Title VII. On appellees' proposed reading of the statute, "on the one hand [employers would] face liability for past discrimination against blacks, and on the other they [would] face liability for any voluntary preferences adopted to mitigate the effects of prior discrimination against blacks." *Weber*, supra, at 210, 99 S.Ct. at 2731 (Blackmun, J., concurring). The necessary result of such a reading would be delay, through over-caution and inevitable litigation, of the remedial goals of the statute.

We are convinced that voluntary compliance is particularly appropriate in the area of public employment. In expanding Title VII's coverage to include public employment, Congress expressed natural concern over federal involvement in state and local Employment matters. Thus, to avoid against possible difficulties Congress required that judicial enforcement proceedings against such employers, when necessary, be pursued by the Attorney General rather than by the Equal Employment Opportunity Commission, 42 U.S.C.A. § 2000e–5(f)(1), in order to place the full force of the federal government behind such enforcement. See, S.Rep.No. 415, 92d Cong., 1st Sess., reprinted in Legislative History, supra at 434. Because of these same concerns Congress placed considerable emphasis on the hope that public employers

would voluntarily comply with Title VII's requirements, or that the Commission would be able to effect conciliation. See e. g., Legislative History, supra at 896 (Senate; remarks of Committee Chairman Williams). Nevertheless, in the present case appellees would have the Commission wait until instructed to institute racial hiring by the federal Commission or until ordered to do so by the federal district court. We do not readily believe that federal law requires states and state agencies to refrain from good faith compliance with federal employment standards only so that a federal court may order them to act. Notions of comity and federal-state harmony would surely be sacrificed by such a conclusion. And such a view is completely contrary to the assumptions on which Congress acted when it amended Title VII. Like Congress, we have no doubt that voluntary state compliance, where forthcoming, is inevitably superior to the often difficult practical problems of federal supervisory jurisdiction. This is precisely the view adopted by the district court when fashioning its 1974 remedial order in *Commonwealth of Pennsylvania v. Glickman,* 370 F.Supp. at 736.

Finally, any action by a public employer in this area will necessarily be subject to the limitations of the fourteenth amendment. *Hazelwood School District v. United States,* 433 U.S. 299, 309 n.15, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977). We do not adopt the view that Congress intended by this remedial legislation further to restrict state corrective action in any way. The extension of Title VII in 1972 to include public employment was intended to be a step forward in ameliorating the existence of racial discrimination in employment, not to be a new obstacle in the path of pursuing employment reform.

Accordingly, given the existing federal judicial finding of discrimination in the Bureau of Fire, and the common pleas court's finding that the Commission's proposed action was a necessary practical step to correct that discrimination, we hold that the Commission was not precluded by Title VII from adopting its proposed plan.

## III

 Appellees next contend that the Commission's plan violates the Pennsylvania Human Relations Act, Act of Oct. 27, 1955, P.L. 744, § 1 et seq., as amended, 43 P.S. § 951 et seq. (1964 & Supp.1979). The Commonwealth Court agreed with appellees, apparently because it viewed the Commission's plan as a violation of Title VII and did not believe that the Pennsylvania legislation would be read differently. 31 Pa.Cmwlth. at 105 n.3, 375 A.2d 841 at 845. Indeed, as our prior cases have suggested, the Human Relations Act should be construed in light of "principles of fair employment law which have emerged relative to the federal [statute] . . ." *General Electric Corporation v. PHRC*, 469 Pa. 292, 303, 365 A.2d 649, 654 (1976) (Pomeroy, J., joined by Eagen and O'Brien, JJ.); see also id., 469 Pa. at 317, 365 A.2d at 662 (Manderino, J., joined by Roberts and Nix, JJ., concurring). Although the independent status of our state statute should not be ignored or diminished, for the reasons that follow we agree that this presents a particularly appropriate situation in which to harmonize the two statutes. It is now established that Title VII does not prohibit private employers from undertaking appropriate voluntary affirmative action. *Weber*, supra. Today we hold that public employers, at least in some circumstances, are also permitted to pursue voluntary corrective action under Title VII. In this light, review of our state legislation demonstrates that it is not a barrier to similar conduct, and that it must not be read as such.

Subsection 955(a) of the Human Relations Act makes it an "unlawful discriminatory practice" for "any employer because of race . . . to refuse to hire or employ" any individual. Subsection 955(b)(3) declares it an unlawful discriminatory practice for any employer to "[d]eny or limit, through a quota system, employment . . . because of race . . . ."[13] Like their Title VII argument, appellees'

13. Subsections 955(a) and (b)(3) provide in relevant part:
 "§ 955. Unlawful discriminatory practices
 It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon member-

argument here starts and ends with a mechanical reading of only part of the statute. Moreover, appellees point to nothing in the legislative history of the Act nor to any instance in the construction or enforcement of the Act since its original enactment in 1955 which would support their restrictive reading. To the contrary, the legislative history of the Act, the time of its enactment and our prior construction of it all demonstrate without the slightest doubt that the Act's prohibitions against the use of race in employment and against quota hiring are not a bar to race-conscious voluntary remedial action.

As the legislative history of the Act makes evident, the pervading purpose of the legislation was to remedy discrimination against those historically subordinated. See generally, 1955 Legislative Journal-House at 429–448; 1955 Legislative Journal-Senate at 2653–66, 2821–28. Nothing in the legislative history suggests an intention to limit in any way the scope of possible remedial action to achieve that goal.

■ The remedial nature of the statute, enacted just one year after *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), is apparent from several of its provisions, including the Legislature's express admonition that:

> ship in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
> (a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required.
> * * * * * *
> (b) For any employer, employment agency or labor organization, prior to the employment or admission to membership, to . . .
> (3) Deny or limit, through a quota system, employment or membership because of race, color, religious creed, ancestry, age, sex, national origin, non-job related handicap or disability or place of birth. . . . "

"The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions hereof shall not apply."

43 P.S. § 962(a). To effectuate the purposes of the Act the Legislature established the Pennsylvania Human Relations Commission, 43 P.S. §§ 956–57, which it gave authority to order a variety of affirmative relief, including anything which, in the Commission's judgment, "will effectuate the purposes of this act . . . ." 43 P.S. § 959. As a result, this Court has not hesitated to enforce Human Relations Commission orders requiring remedial racial quotas in response to racially discriminatory practices. *PHRC v. Chester Housing Authority*, 458 Pa. 67, 89 n.34, 327 A.2d 335, 346 (1974), cert. denied, 420 U.S. 974, 95 S.Ct. 1396, 43 L.Ed.2d 654 (1975); *Balsbaugh v. Rowland*, 447 Pa. 423, 290 A.2d 85 (1972). It is established that the Human Relations Act prohibits actions, such as the Pittsburgh Civil Service Commission's 1972 testing procedures, which have an unjustifiable racially disproportionate impact. *PHRC v. Chester Housing Authority*, supra; see *General Electric Corporation v. PHRC*, supra (Pomeroy, J., joined by Eagen, and O'Brien, JJ.); id. (Manderino, J., joined by Roberts and Nix, JJ., concurring). Thus, at least during some recent time, the Pittsburgh Civil Service Commission was in probable violation of the Act. In such an event, the Human Relations Commission could well have ordered some form of mandatory race-conscious remedy, not unlike that voluntarily adopted by the Civil Service Commission.

Consistent with the statute's remedial purpose, however, the Legislature expressly charged the Human Relations Commission with the initial duty to attempt to obtain voluntary compliance by "conference, conciliation and persuasion" in cases where it believes discriminatory practices exist. 43 P.S. § 959. Clearly, the absolute proscription on voluntary remedial affirmative action which appellees urge is completely contrary to the statute's basic express preference for voluntary compliance.

Additionally, such a restrictive view of the Act would tie the hands of any employer, private or public, who desired voluntarily to comply with Title VII by instituting remedial race-conscious preferences. On appellees' theory, private employers who thus sought, under *Weber*, to remedy racial discrimination in their businesses would be prohibited from doing so by state law. Such a reading of the Human Relations Act would render *Weber* a nullity in this Commonwealth.

Appellees' approach is plainly inconsistent with Title VII's evident reliance on state support in remedying employment discrimination. Title VII expressly requires aggrieved parties first to file complaints with any analogous state agency and provides that federal investigation by the Equal Employment Opportunity Commission should await local attempts at resolution. 42 U.S.C.A. § 2000e–5(c). This reliance on state action was specifically reaffirmed when Title VII was amended to include public employment. As the House report on the bill which amended the Act stated:

"In extending Title VII coverage [to public employment] the Committee recognizes that States frequently can best deal with violations which occur within their boundaries and has, accordingly, retained the provisions . . . whereby the [Equal Employment Opportunity] Commission will defer to appropriate State agencies cases where the State or local agency can grant the complainant relief similar to that which he can obtain with the [Equal Employment Opportunity] Commission under the provisions of this bill."

H.R.Rep.No. 238, supra at 2154. See Legislative History, supra at 198 (remarks of Rep. Perkins). An interpretation of the Pennsylvania Human Relations Act which would prohibit voluntary compliance with Title VII by employers in this Commonwealth would produce an unworthy default in the state support anticipated by Congress and incorporated in Title VII. Finally, appellees' theory, which would make race-conscious remedial action contingent on a Commission or court order, would be a significant setback to

remedial progress given the already over-crowded dockets of the enforcement agencies and the courts.

This myopic view of the Human Relations Act is strenuously opposed by the Human Relations Commission as appellant-intervenor in this case. We have previously acknowledged that deference should be given to the views of the Commission when we are required to construe its governing statutory provisions. See *PHRC v. Uniontown Area School District*, 455 Pa. 52, 77–78, 313 A.2d 156, 169 (1973) (Pomeroy, J., joined by Eagen and O'Brien, JJ.); id., 455 Pa. at 83, 313 A.2d at 171 (Roberts, J., joined by Jones, C. J. and Nix, J., concurring). The Commission, in urging reversal here, states that the proper resolution of this issue is "of vital importance to the Commission and the citizens of the Commonwealth . . . ." Brief for Pennsylvania Human Relations Commission at 1. The Commonwealth, another appellant-intervenor, urges with equal force the harm which such a restrictive view of the Human Relations Act would perpetrate on the important unfinished job of remedying racial discrimination. In this very case, despite vigorous good faith efforts, the Civil Service Commission was unable, without resort to racial preferences, to increase minority representation in the Bureau of Fire more than 1%. This record thus clearly demonstrates the degree to which prior discriminatory practices will continue to affect present employment opportunities unless effective voluntary measures are available. We refuse to read our Legislature's important remedial legislation to prohibit voluntary efforts to eradicate the continuing effects of established discrimination.

## IV

So too, we must reject the contention that our civil service law prohibits the Commission's voluntary remedial action. Appellees claim that the Commission's proposed action violates the Second Class Cities Civil Service requirements for the appointment of firefighters. 53 P.S. § 23491 et seq. (1957 & Supp.1979). They rely on section 23493.1(a) of the Act, which requires that:

"(a) Both original appointments and promotions to any position in the competitive class in any bureau of fire in any city of the second class shall be made only from the top of the competitive list: Provided, however, That the appointing officer may pass over the person on the top of the competitive list for just cause in writing. Any person so passed over shall, upon written request, be granted a public hearing before the Civil Service Commission." [14]

Appellees argue that the Commission's decision to certify from two lists is inconsistent with the express language of the statute and is therefore impermissible. We find such a mechanical reading of the statute inappropriate and erroneous. Our careful review of the legislative history of this section of the Civil Service Act convinces us beyond any doubt that the Legislature did not intend to foreclose the Commission from taking action to remedy past and existing discrimination in the Pittsburgh Bureau of Fire.

The Civil Service statute under review is itself remedial legislation. Traditionally the civil service has been adopted to alleviate the problem of patronage hiring and promotion in public employment. *Geis's Appeal*, 341 Pa. 413, 416–17, 19 A.2d 368, 369 (1941). The evil to be remedied is the spoils system which affords those in political power the discretion to award jobs to political and social friends, rather than to those more qualified. The legislative history of § 23493.1 in both the Senate and the House makes clear that this is precisely the problem our Legislature sought to alleviate in the Pittsburgh Bureau of Fire. Although enacted as part of the Second Class Cities Code, the statute in fact applies only

14. Appellees urge that because the Commission has violated § 23493.1 of the Civil Service provisions that it therefore has also violated § 23492 of the Act, which provides:

"The civil service commissions in cities of the second class shall not have the power to change any rule or regulation which shall have been established and which is in force and effect on the date of the approval of this act, in so far as the same shall apply to the positions provided in this act to be in the competitive class; nor shall any such commission have the power to waive any such rule or regulation in any specific case or cases."

Because we hold that the Commission's action is permitted by § 23493.1 we need not consider the effect of § 23492.

to the City of Pittsburgh, a fact clearly understood by the Legislature. For, as a study discussed in the Legislature indicated, Pittsburgh was among a small number of cities still plagued by overt political patronage in the hiring and promotion process of its Fire Bureau. 1963 Legislative Journal-Senate at 679. As one leading supporter of the statute announced at the time of its passage in the Senate, the "only purpose" of the legislation was to give Pittsburgh better fire protection by creating "a fire department completely unhampered by any political interference." Id. (Remarks of Sen. Fleming). It would be ironic indeed if this statute, remedial in purpose, prevented the Commission from redressing imbalances in the Fire Bureau which were undoubtedly caused or perpetuated by the unbridled discretion that the original spoils system permitted. We do not read the statute to require such a regressive result.

Importantly, the record in this case indicates that the Commission's action does not conflict with the statutory requirement of merit selection. The trial court's findings of fact, supported by uncontradicted substantial evidence, are that all of the candidates who passed the Commission's 1975 examination were equally qualified for jobs as firefighters. Testifying before the court of common pleas, the Commission's Chief Examiner stated that a score higher than the passing score of 75 was not evidence of greater qualification:

"Our professional consultants . . . have told us . . . that anyone who passes all the events is qualified for the job. The difference between the score of say, 75 a minimum passing score, and a score of 95, is not significant."

"There is no data to indicate that a higher score indicates a person will be any better on the job."

Record at 84a, 93a. This testimony is reflected in the trial court's unchallenged findings that "the minority applicants who would be given preference are as qualified for the position of firefighter as those who scored higher on the examination." Because of these findings we need not decide what discretion the Commission might have had to certify minority applicants who were less qualified than appellees.

We note, however, that the very section on which appellees base their claim expressly allows the Commission the discretion to refuse to hire from the "top of the . . . list" for "just cause in writing." We do not doubt that in some circumstances remedial compliance with other state and federal employment standards would be sufficient to meet this just cause requirement.

Finally, other provisions of the statute support the view that the Legislature was not opposed to permitting the Commission to advance other state interests not inconsistent with the general prohibition on patronage hiring. Subsection (f) of § 23493.1 requires the Commission to add ten points to the score of every passing applicant who has been honorably discharged from the armed forces after serving during war or armed conflict. Indeed, every one of the twenty candidates the Commission planned to certify would not have been certified but for this veterans preference. Brief for Appellants, City of Pittsburgh, Pittsburgh Civil Service Commission at 19; see Record at 85a. Nothing suggests that the Legislature believed veterans to be necessarily more qualified for work as firefighters. Rather the evident objective was the furthering, within the civil service scheme, of an independent state employment goal. We view the Commission's action in this case as, similarly, advancing an important state policy fully consistent with the civil service objectives. Accordingly we hold that the civil service statute is not a bar to the Commission's proposed action.

V

We turn finally to appellees' contention that the Commission's proposed plan violates the equal protection clause of the fourteenth amendment to the United States Constitution. Appellees do not question the power of the state or federal judiciary to order appropriate race-conscious relief after a finding of discrimination. Clearly, such power is well-established. See e. g., *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *PHRC v. Chester Housing Authority*,

supra. Indeed, it is settled that racially neutral remedies for racial discrimination are, in some circumstances, themselves constitutionally inadequate. Thus in the area of school desegregation the Supreme Court has long placed an affirmative obligation on local school districts to adopt race-conscious plans to eliminate past discrimination "root and branch." *Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). In fact the Court has unanimously permitted local school boards voluntarily to adopt desegregation plans which make express reference to race. *McDaniel v. Barressi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971). In the area of employment discrimination as well, the Supreme Court has permitted court-imposed race-conscious remedial action for found violations of Title VII. *Franks v. Bowman Transportation Company*, supra. And the federal courts of appeals have consistently upheld racial hiring preferences as appropriate remedial action. See pp. 866–867, supra. The question before us is whether the equal protection clause prohibits a public employer, found guilty of prior racial discrimination, from voluntarily adopting a similar remedy.

Our touchstone is *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). *Bakke* presented a challenge to the special admissions program of the Medical School of the University of California at Davis on the grounds that it violated both Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000d et seq., and the equal protection clause. The University's program set aside up to sixteen places for minority applicants who did not compete against other applicants for admission. Mr. Justice Brennan, joined by Mr. Justice White, Mr. Justice Marshall and Mr. Justice Blackmun, believed that Title VI, which prohibits race discrimination by those receiving federal funds,[15] goes no further in prohibit-

15. 42 U.S.C.A. § 2000d provides:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

ing the remedial use of race than the equal protection clause. In their view, the program was permissible on both grounds. Mr. Justice Stevens, joined by the Chief Justice and by Mr. Justice Stewart and Mr. Justice Rehnquist, viewed Title VI as prohibiting all race-conscious action by those it covers and thus would have held the University's program illegal, without reaching the constitutional question. Mr. Justice Powell, writing separately, agreed with Mr. Justice Brennan's view that Title VI does not place any limits on remedial state action beyond those imposed by the Constitution, but disagreed with Mr. Justice Brennan's position on the requirements of the Constitution. The University's program did not meet Mr. Justice Powell's more restrictive view of constitutionally acceptable remedial state action.

Although *Bakke* thus provides us with no single opinion of the Court concerning the constitutional limitations on affirmative action, we believe that the Commission's plan in this case satisfies the constitutional standards of all five Justices who considered the question. We are satisfied that our view is consistent with what Mr. Justice Brennan described as "the central meaning" of the Court's opinions in *Bakke* when they are read together:

"Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area."

438 U.S. at 325, 98 S.Ct. at 2766. Because the Commission's plan meets even the strictest of proposed constitutional standards, we reverse the order of the Commonwealth Court.

Mr. Justice Brennan and the three Justices who joined him expressed the view that the equal protection clause allows racial classifications designed to further remedial objectives if the classifications "serve important governmental objectives," if they are "substantially related to achieve-

ment of those objectives," and if the classifications do not stigmatize any group or single out "those least well represented in the political process to bear the brunt of a benign program." 98 S.Ct. at 2784, 2785. These four Justices left no doubt that providing a remedy for past racial discrimination was an important governmental objective. Indeed, these Justices found the University of California's purpose of remedying the effects on medical school admissions of past societal discrimination a suitable goal. These Justices expressly declared that remedial measures taken in response to a judicial finding of prior discrimination would be a fortiori acceptable. Id. at 365 n.42, 98 S.Ct. at 2787.

Second, the Commission's plan is, without doubt, appropriately related to its remedial goal. As we have already recited, there is substantial evidence in the record to indicate that the Commission's action in this case was a necessary practical step toward achieving adequate minority representation in the Bureau of Fire. As the trial court found: "No other alternative than a preferential hiring quota will relieve the situation." Appellees do not challenge these findings. The City's request to certify candidates for twenty new positions in the Bureau presented the Commission with an unusual opportunity to remedy a racial imbalance which has persisted despite substantial efforts at minority recruitment. Again, the Commission's proposal did not interfere with any existing employment rights.

Third, as with the Davis admissions program, neither blacks nor whites were stigmatized or singled out to bear the burden of the Commission's plan. Although not determinative, it is noteworthy that those minority applicants effected by the program voluntarily intervened as defendants in the trial court urging support of the Commission's action. Similarly, the International Association of Black Professional Firefighters has taken the same position, amicus curiae, at earlier stages of this litigation. Furthermore, white applicants were not forced to bear an inappropriate burden. Nothing in the record suggests that appellees were any more qualified than those minority applicants the Com-

mission wished to certify. Still, fifty percent of those to be certified by the Commission were white. And under applicable state civil service law appellees would have remained on the eligibility list, which could have remained in force for up to three years. See 53 P.S. § 23453. Thus it was not unlikely that, under usual practices, appellees would have been certified at a later date. Any potential harm to appellees simply does not outweigh the necessity for the effective remedial action taken by the Commission. There is no question that the Commission's plan is acceptable when judged by the standards adopted by Mr. Justice Brennan and the three other Justices who joined him.

In Mr. Justice Powell's view, racial classifications are always suspect and accordingly should be subject to the Court's existing strict scrutiny doctrine. As Mr. Justice Powell described this approach, a state's use of even a remedial racial classification would be permissible only if:

> " 'its purpose or interest is both constitutionally permissible and substantial, and . . . its use of the classification is "necessary . . . to the accomplishment" of its purpose or to the safeguarding of its interest.' "

438 U.S. at 305, 98 S.Ct. at 2756–57 (citations omitted). Like Mr. Justice Brennan and those who joined him, however, Mr. Justice Powell acknowledged that the objective of remedying past discrimination was sufficiently substantial:

> "The State certainly has a legitimate and substantial interest in ameliorating, or eliminating where feasible, the disabling effects of identified discrimination."

Id. at 307, 98 S.Ct. at 2757. Mr. Justice Powell strongly stated that, given the predicate of judicially determined discrimination, remedial race-conscious action would be permissible:

> "After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated."

Id. at 307, 98 S.Ct. at 2758. The Commission's remedial plan plainly satisfies this standard.

Thus the only remaining question under this approach is the validity of the means adopted by the Commission. Although Mr. Justice Powell's strict scrutiny approach calls for a test of necessity when racial classifications are employed, his opinion strongly suggests that explicit racial preferences would meet this standard if they are in response to "judicial, legislative or administrative findings of constitutional or statutory violations." Id. at 307, 98 S.Ct. at 2758. *Price v. Civil Service Commission of Sacramento,* supra at 281 n. 17, 161 Cal.Rptr. at 490, 604 P.2d at 1380; see remarks of Professors Choper and Tribe at the First Annual Supreme Court Review and Constitutional Law Symposium, reprinted in The Supreme Court 1978–1979 at 43, 65 (1979). For the obligation to correct prior violations may well make remedial preferences necessary. In disapproving of the University of California's self-initiated admissions program, Mr. Justice Powell specifically distinguished the Court's employment discrimination cases and the decisions of the federal court of appeals which have required racial preferences as remedies for established violations of the federal employment laws. Id. at 298–301, 98 S.Ct. at 2753–55. And Mr. Justice Powell did not suggest that other governmental bodies may not take similar action to remedy discrimination once an appropriate determination of prior discrimination has been made. Indeed, as we have suggested, a barrier to all but court-ordered action would frustrate our usual preference for voluntary compliance, would delay remedial action and, where a state employer is involved, would unnecessarily disrupt federal-state relations. We view the findings of discrimination in the Pittsburgh Bureau of Fire embodied in the federal court decision in *Commonwealth of Pennsylvania v. Glickman* as sufficient to meet the threshold requirement articulated by Mr. Justice Powell. And, for reasons we have already given, we believe the Commission's plan an appropriate response to those findings. The record plainly establishes the ineffectiveness of other remedial action. We are satisfied, given the unchallenged findings of the common pleas court, that the Commission's plan was, indeed, a necessary step toward eliminating the existing effects of the prior

discrimination. Accordingly, we believe the Commission's remedial plan permissible even under the approach of Mr. Justice Powell. We therefore hold that the Commission's plan is not prohibited by the equal protection clause.

The order of the Commonwealth Court is reversed and the order and decree of the Court of Common Pleas of Allegheny County is reinstated.

In the equity appeal, each party to pay own costs.

MANDERINO, J., did not participate in the decision of this case.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

I dissent and would affirm the Commonwealth Court's holding in this case. (*Chmill, et al. v. City of Pittsburgh, et al.*, 31 Pa.Cmwlth. 98, 375 A.2d 841 (1977).) This case reached the state courts after initial rulings made in the Federal District Court. In 1974, the U.S. District Court for the Western District of Pennsylvania, in *Commonwealth of Pennsylvania v. Glickman*, 370 F.Supp. 724 (W.D.Pa.1974), found that the City of Pittsburgh had been discriminating against blacks in the hiring of fire fighters. It was specifically found that the testing procedures were "discriminatory."

Following the 1974 ruling, the Civil Service Commission for the City of Pittsburgh abandoned its written testing procedure and, instead, put into effect a job-related physical agility test. No one has claimed, as indeed it would be difficult to assert, that the physical agility test discriminated against blacks.

Despite the non-discriminatory nature of the test, and despite the abundant attempts to recruit blacks through an affirmative action program, the effects of the 1975 testing procedure were that only three of the first twenty of those who passed the test were black. Upon observing this result, the Civil Service Commission, without seeking legislative or court approval, independently imposed a quota system

whereby ten whites and ten blacks were certified to become fire fighters. Those whites who had been eliminated from the certification through the quota system filed the instant case.

In an attempt to analyze the appropriateness of such a unilateral action by the Commission, it is necessary to look to the position which the Federal Court has taken in these proceedings.

The majority accepts the fact that there must be a judicial finding of discrimination before a quota system can be invoked. In support of a finding that this has occurred in the instant case, the majority relies on the "existing federal judicial finding of discrimination in the Bureau of Fire", and the Common Pleas Court's finding that the Commission's proposed action was a necessary practical step to correct that discrimination.

As for the Common Pleas Court's finding, little solace can be gained, since this Court's ruling was *subsequent* to the Commission's actions and cannot be used as a basis for finding that the Commission had a judicial finding upon which it could rely. This most certainly is a boot strap argument.

As for the supposed federal finding of discrimination, we must analyze what the Federal Court has said in this case.

In *Glickman, supra,* Judge Teitelbaum specifically rejected a quota system for fire fighters. The judge saw a difference between police departments and fire departments, and found that, as for a fire department, there was not the "urgency and necessity for imposing the *drastic remedy* of a racial hiring quota." (Emphasis added).

*Glickman* was followed in the Western District Court by *Commonwealth of Pennsylvania v. Flaherty,* 404 F.Supp. 1022 (W.D. of Pa.1975). Here, the Federal District Court did invoke a quota system for the hiring of police officers. However, the Court, through Judge Weber, adopted the reasoning of the *Glickman* case and stated:

We agree entirely with the rationale of Judge Teitelbaum of this court, as expressed in [Glickman] on a greater urgency of the application of a quota system in a case involving a police force than a fire department. (p. 1030)

If there was any doubt left that the Federal Court did not believe that a quota system should not be invoked for the Pittsburgh fire fighters, that doubt should have been dispelled when defendants tried to remove the instant case to the Federal Court. In denying removal and in remanding the case to the state court, Judge Rabe Marsh said:

Indeed, in the instant case, *it may well be that a racially-oriented hiring system is more inconsistent with federal equal rights law than is the civil service system of hiring* on the basis of merit. Section 703 of Title VII of the Civil Rights Act of 1964 specifically states that preferential treatment is not required on account of numerical or percentage imbalance. (Emphasis added). *Chmill, et al. v. City of Pittsburgh, et al.,* Civil Action 76–537.

Under all of the above, it is difficult to perceive how the majority can argue that the Civil Service Commission was responding to a judicial mandate in imposing the quota system which the Federal Court itself had rejected.

The overriding question to be asked here is whether this Court is going to permit a Commission established by the legislature to "enact" rules contrary to those established by the legislature. If the Commission felt that a quota system was required to right past discriminatory wrongs, it would have been appropriate for the Commission to go back to Federal Court and seek a judicial determination based upon a record developed in open court. At least this procedure would have preserved the integrity of the statute while allowing the court to determine if the time had indeed arrived when the quota system was the only means left to correct the past discriminatory conduct. Of course, the Commission could have alternatively sought legislative changes which would have permitted the creation of the two certified lists.

Here, the Commission took neither of the above available courses of action and, instead, disregarded the very Act of the legislature under which it had been created. The legislative history of the Civil Service Act (53 P.S. § 23491 et seq. (1957) & Supp.1979), upon which the majority seems to rely, clearly establishes an intention on the part of the legislature to do away with political patronage in the hiring of fire fighters. Nowhere in this history is there any indication that the legislature sought to control every other evil faced by society. And, clearly, the Commission itself was not given any authority in the Act to remedy all of society's ills on its own.

The majority attempts to support its argument that the Commission has the power to advance other state interests in addition to eliminating the patronage system, by pointing to Subsection (f) of § 23493.1 which allows the addition of 10 points to the score of every passing applicant who has been honorably discharged from the armed services. This is a self-defeating argument. It is self-defeating because it supports the inescapable conclusion that the Commission must be guided by its legislative creator as to what state interests it may advance. A consistent reading of the majority opinion would require a finding that the Civil Service Commission could independently decide that the time had come to eliminate the veteran's preference points. And, yet, the majority does not openly suggest that the Commission does have this authority.

And, under the majority's view, what other "state policy fully consistent with the civil service objectives" could the Commission now unilaterally invoke without prior legislative approval? Further, is it to be left to the Commission to decide what our "state policy" is? Should the Commission now be permitted to decide that the gay rights movement requires a state policy that a certain percentage of the fire bureau be gay? Should the Commission now be permitted to decide that the fire bureau be composed of 50% women? I believe that it is up to our elected officials in the legislature to determine "state policy". The effects of a decision that

an agency can go outside the bounds of the legislation which created it to determine policy would create a chaotic situation not apparently envisioned by the majority. Under the majority, all agencies could establish their own policies.

The majority relies on the assertion that all of the candidates who passed the Commission's 1975 examination were equally qualified as fire fighters. This statement begs the question because the legislation creating the Commission called for applicants to the competitive class being appointed "only from the top of the competitive list." In fact, there would be little use in creating a competitive list if the Commission were left to its whim in determining who from the entire list of successful applicants it would certify. The very purpose of the Act was to eliminate discrimination in hiring by requiring a mechanical certification from the top down according to the applicant's score on the test. The majority would destroy this noble goal by once again giving to the employing agency the right to pick and choose who would be certified. In fact, the trial court found that the Civil Service Commission "violated the express terms of the Civil Service Act . . . original (appointments) must be made from the top of the list. The (Civil Service Commission's) quota system deviates from this straight down the list approach in the Act. The purpose of the Civil Service Act was to guarantee that appointments would be made solely on the basis of merit, to obtain the best man or woman for the job."

Finally, it is the opinion of this writer that the Supreme Court's ruling in *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) is not relevant here because we are dealing with an agency created by the legislature which did not have the power or authority to invoke a unilateral quota system.

This Court should not lose sight of the statement made by the Federal Court in *Glickman, supra,* that a quota system is a "drastic remedy." It is drastic because it attempts to correct previous wrongs by interfering with the rights of persons who were not involved in those wrongs. For this

reason, if none other, the decision as to whether or not a quota system should be invoked should be made by those parties who have the constitutional and legal authority to make them. I, therefore, dissent and would affirm the Commonwealth Court's decision.