Argued and submitted October 6, 1981, affirmed January 26, 1982

PORTLAND POLICE ASSOCIATION,
*Petitioner on review,*

*v.*

CIVIL SERVICE BOARD OF PORTLAND et al,
*Respondents on review.*

(No. A8004-02027, CA 18732, SC 27970)

639 P2d 619

Henry K. Drummonds, of Kulongoski, Heid, Durham & Drummonds, Eugene, argued the cause and filed a petition for petitioner. On the brief were Terry DeSylvia, Myron Schreck, and Black, Kendall, Tremaine, Boothe & Higgins, Portland.

Richard A. Braman, Portland, argued the cause and filed briefs for respondents.

James M. Brown, Attorney General, Salem, John R. McCulloch, Jr., Solicitor General, Michael J. Tedesco, Assistant Attorney General, and Judith L. Miller, Certified Law Student, Salem, filed a brief as amicus curiae for Governor of the State of Oregon.

Susan P. Graber and Pamela L. Jacklin, Portland, filed a brief as amicus curiae for American Civil Liberties Union of Oregon, Inc.

PETERSON, J.

## PETERSON, J.

This is a proceeding for declaratory and injunctive relief in which plaintiff Portland Police Association (Association) seeks to have a rule adopted by the defendant City of Portland Civil Service Board (Board) declared void and its implementation enjoined. The Association contends that the challenged rule is in conflict with the Portland charter and is outside the Board's rulemaking authority. The trial court agreed with the Association and granted the relief prayed for. The Court of Appeals reversed, holding that there was no charter conflict and that the rule was within the Board's rulemaking powers. 52 Or App 285, 628 P2d 421 (1981). We affirm the Court of Appeals.

Association is the certified bargaining representative for police officers employed by the City of Portland. Board is the agency responsible, under the city charter, for certifying eligible candidates for appointment to vacant civil service positions, including those within the Police Bureau.

In 1903, by charter amendment, the City of Portland enacted its present civil service system. The purpose of the system is to ensure that all appointments to, and promotions within, the city's subordinate administrative service are made solely on the basis of merit and fitness and not on the basis of political affiliation or patronage, nepotism, or other extraneous grounds irrelevant to an applicant's ability. Charter section 4-101 provides, in relevant part:

> "*All* appointments to and promotions in the subordinate administrative service of the city *shall be made solely according to fitness, which shall be ascertained by open competitive examination,* and merit and fidelity in service, as provided for in this article. * * *." (Emphasis added.)

The Civil Service Board is the entity empowered by the charter to administer the civil service system and to devise and conduct the qualification examinations. *See generally, Drake v. City of Portland,* 172 Or 558, 567-569, 143 P2d 213 (1943).

Under the charter the Board has responsibility to:

1. Classify offices, places and employments within the public service based upon their functions and compensations. City of Portland Charter, § 4-104.[1]

2. Devise and administer periodic competitive examinations to ascertain the relative fitness and merit of applicants. § 4-106.[2]

3. Prepare and maintain a register for each grade or class of positions in the civil service, ranking applicants upon the basis of their examination score. § 4-107.[3]

4. Certify, in the event of a vacancy within the civil service, the names of the three eligible candidates standing highest on the applicable register (the so-called "rule of three"). § 4-108. This section provides, in part:

> "Whenever there shall be a vacancy in any position in the classified civil service, the appointing authority shall immediately notify the board thereof. The board shall thereupon certify to such appointing authority the names

---

[1] The full text of section 4-104 is as follows:

"The board shall classify, with reference to the examinations hereinafter provided for, all the offices, places and employments in the public service of the city to which the provisions of this article are applicable. Such classification shall be based upon the respective functions of said offices, places and employments, and the compensation attached thereto, and shall be arranged so as to permit the grading of offices, places and employments of like character in groups and subdivisions. The offices, places and employments so classified shall constitute the classified civil service of the city; and after the taking effect of this charter, no appointment or promotion to any such office, place or position shall be made except in the manner provided in this article."

[2] Section 4-106:

"The board shall, from time to time, hold public competitive examinations to ascertain the fitness of applicants for all offices, places and employments in the classified civil service. * * *. Such examinations shall be practical in their character, and shall relate only to those matters which may fairly test the relative fitness of the persons examined to discharge the duties of the positions for which they are applicants and shall include, when appropriate, tests of health and physical qualifications and of manual, clerical or professional skill. No question in any examination shall relate to political or religious opinion, affiliations or services. * * *"

[3] Section 4-107:

"The board shall prepare and keep a register for each grade or class of positions in the classified civil service of the persons whose general average standing upon examination for such grade or class is not less than the minimum fixed by the rules of the board, and who are otherwise eligible. Such persons shall take rank upon such register as candidates in the order of their relative excellence, as determined by examination, without reference to priority of time of examination. Candidates of equal standing shall take rank upon the register according to the order in which their applications were filed. * * *"

and addresses of the three eligible candidates standing highest upon the register for the class or grade to which such position belongs, but, if there be less than three, the board shall so certify all such candidates upon the register. When vacancies exist in two or more positions of the same class in the same department at the same time, the board may certify a less number than three candidates for each position, but those certified must be the eligible candidates standing highest upon the register. The appointing authority may require the candidates so certified to come before him, and shall be entitled to inspect their examination papers. The appointing authority shall appoint to each vacant position, on probation for a period to be fixed by the rules, one of the candidates so certified. Within such period, the appointing authority may discharge such probationer, and, in like manner, appoint another of such candidates, and so continue until all said candidates have been so appointed; but the appointing authority must make permanent appointment from said list of candidates unless, upon reasons assigned in writing by the appointing authority, the board consents to and does certify a new list of candidates. If any probationer is not discharged within the period of probation, his appointment shall be deemed permanent. * * *"

5. "[M]ake rules to carry out the purpose and provisions of this article" from time to time, including those relating to examinations and appointments. § 4-105.

Purportedly pursuant to its section 4-105 rulemaking powers, the Board adopted Rule 3740 relating to affirmative action certification. This rule is the one challenged by the Association in this suit. Rule 3740 provides:

"An appointing authority may request in writing that affirmative action certifications be authorized to fill vacancies, in entry level classifications, in a particular department, office or bureau. The request shall include:

"(a) Identification of the protected group (minorities, a class of minorities, or women) to which the request applies.

"(b) A documented showing that past recruitment, examination and appointment practices have resulted in an underutilization of the protected group in the specific job category within the initiating department, office or bureau.

"(c) A statement explaining the compelling interest of the department, office or bureau in achieving a balance

between members of the protected group in its workforce and those in the relevant labor force.

"The request must be approved by the Board. Following approval, all certifications shall be as provided in this paragraph, until approval of the affirmative action certification is revoked by the Board. When a notice of vacancy in an entry level position is received from a department, office or bureau for which affirmative action certification has been approved, two lists of the names of eligibles available for appointment will be certified by the Board. One list will contain names of the three eligibles highest on the register for the classification and one list will contain names of the three eligibles in the protected group highest on that register. When notified of multiple vacancies, two more names than the number of vacancies will be included in each list. Should the eligible register not contain names of a sufficient number of eligibles in the protected group to meet the requirement of this paragraph, the names of all eligibles in the protected group shall be listed in the certification.

"The purpose of this rule is to aid a department, office or bureau to voluntarily achieve hiring goals according to the Affirmative Action Plan adopted by the City Council, without imposing absolute hiring quotas with respect to a protected group. When there no longer is an underutilization of the protected group in the specific job category within the initiating department, office or bureau, the Board, upon request of the appointing authority or any interested party, will revoke its approval of affirmative action certification for that department, office or bureau."

Rule 3740, in substance, requires the Board to certify, upon an agency's written request, a second and alternative list of eligible applicants. This second list will be composed of the three eligible applicants standing highest on the applicable register who are members of the relevant protected minority group. The appointing authority is then apparently given the option to choose an applicant to fill the vacancy from *either* of the certified lists.

The Association contends that Rule 3740 is in direct conflict with charter § 4-108, is outside the Board's authority, and is thus void. It contends that charter sections 4-108 and 4-101 require that all certification and hiring for available positions be done strictly on the basis of register placement, as determined by examination score,

and that the second and alternative "protected group" list is in direct and irreconcilable conflict with this requirement.

To the contrary, the Board and the *amici curiae* contend: (1) that the challenged rule is not in conflict with the charter and is within the Board's rulemaking power, and (2) that even if the rule is in conflict with the charter, the Board has the power to implement an affirmative action program to bring the city into compliance with overriding federal, state and local equal employment opportunity laws and regulations (the so-called "preemption argument" that these laws and regulations preempt the charter provisions which conflict with Rule 3740).

The trial court held that however laudatory the Board's motivation, the rule was outside the Board's rulemaking authority. The Court of Appeals, in reversing, did not reach the preemption question, holding that the rule was not in conflict with the charter but was within the Board's rulemaking powers.

At the outset we note that the wisdom of the challenged rule is not in issue. Rather, the sequence of potential issues in determining the validity of a rule designed to accord special consideration to one or another sex, members of ethnic minorities, or other groups, is as follows: (1) Does the source of the agency's authority (here the city charter) either (a) authorize the agency to accord or (b) preclude the agency (here the Civil Service Board or the hiring agency) from according special consideration for the purpose for which the agency proposes to accord it? (2) If the agency's intended purpose is within its authority, and nothing in the charter precludes its choice of action, is its action either compelled or precluded by some other state law? (3) Specifically, in the context of according special consideration to gender or other innate personal characteristics, do the reasons for the agency's action avoid "granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens," Or Const Art I, § 20? (4) Is the action either compelled or precluded by state or federal law, including the fourteenth amendment?

The record presented by the parties in this proceeding does not call for decision of most of these

potential issues. We reach only the questions of compliance with the city charter and the possible effect of compliance with obligations imposed on the city by state or federal nondiscrimination laws.

## I

■ The first issue to be resolved is whether Rule 3740 is in conflict with the charter. A city's charter is, in effect, the city constitution. Any city ordinance, rule, or regulation in conflict with its provisions is void. *Harder v. City of Springfield,* 192 Or 676, 683, 236 P2d 432 (1951);[4] *Joplin v. Ten Brook,* 124 Or 36, 38-39, 263 P 893 (1928); *Pioneer Real Estate Co. v. City of Portland,* 119 Or 1, 8, 247 P 319 (1926).

The Board does not contend that it is explicitly required by the charter, or by state or federal law, to adopt this particular affirmative action program. The Board contends that the following language appearing in charter section 4-108 allowed it to adopt the Rule 3740 dual-list scheme:

"* * * but the appointing authority must make permanent appointment from said list of candidates unless, upon reasons assigned in writing by the appointing authority, the board consents to and does certify a new list of candidates. * * *"

The Board's basic argument is that, affirmative action considerations aside, if for "* * * valid reasons assigned in writing * * *," the appointing authority is dissatisfied with the original list of three candidates and sufficiently justifies its dissatisfaction to the Board, the Board is authorized to make up and certify a second and alternative list of eligible candidates which would be more to the appointing authority's liking, regardless of the

---

[4] "A city charter constitutes the organic law of a municipality. It must be first consulted to determine the rights, powers and privileges and the limitations of the authority of the city's legislative body. The municipality's action must find its support therein and everything to the contrary must give way to the mandate of that body of the city's organic law, unless the charter itself is in conflict with the constitution of the state. It cannot, by enacting a general ordinance * * * enlarge, restrict or repeal the express substantive provisions of its charter. This proposition is so elementary that no citations of authority are necessary to demonstrate the truth of its assertion." *Harder v. City of Springfield,* 192 Or 676, 683, 236 P2d 432 (1951).

standing upon the register of the second group of candidates. Thus, for example, if the police bureau had a particular need for women or ethnic minority officers, but the original certified list contained only white male applicants, it could reject this list and request an alternative list consisting only of women and minority applicants who have qualified and are on the register.

The Association contends that that clause comes into play only when none of the three candidates certified on the original list are qualified, available, or acceptable to the appointing authority. In addition, it contends that the second list certified must be comprised of the *next three* eligibles standing highest on the register.

The Board and the *amici* contend that the purpose behind the charter provisions relating to merit-based selection will not be compromised by the dual-list scheme. They argue: First, all "protected group" members on the second alternative list will have been certified "fit" by their passage of the entrance exam. Second, the policy underlying the civil service system is to prevent the abuses of an earlier day when public employment positions were regularly filled through political patronage and nepotism rather than merit; that the open competitive examinations, ranked register, and limited certification measures were adopted to prevent family and political ties from being the criteria for public employment. Thus, remedial affirmative action is not an evil sought to be suppressed through the merit-based hiring system and the charter should not be construed so as to prevent its implementation. Third, that although the charter clearly envisions that merit will be the primary consideration in the hiring process, the individual's raw examination score is not the only factor the prospective employer may permissibly consider; that by requiring three candidates to be certified and allowing the employer to pick one of the three or to request a second list, the charter clearly contemplates that other relevant factors may be weighed. They conclude that Rule 3740, which allows the prospective employer to take into consideration race and sex factors, in choosing between *eligible* candidates *if* compelling justification is demonstrated, is therefore not in conflict with the charter provisions. The Court of Appeals, terming the rule "innocuous," agreed with this

argument and noted that, under the second list provision already included in section 4-108,

> "* * * the possibility exists even without affirmative action certification that a minority person or woman who has a lower score than a white male might nevertheless be hired over him." 52 Or App at 292.

The contention that raw examination scores alone are not conclusive for every civil service position depends on whether the appointing authority and the Board have identified other valid qualifications of "fitness" to be met in determining who is "otherwise eligible" within the meaning of section 4-107. There is no doubt that sections 4-101 and 4-106 emphasize competitively testable characteristics of "fitness"; yet even the "physical qualifications" mentioned in section 4-106 cannot always be equally acquired by every ambitious and conscientious applicant. Although sex or ethnic background ordinarily should be irrelevant to any single position, we cannot say in the abstract that the Board under no circumstances could find the presence of a number or proportion of persons of a given background relevant to the composition of a collective body of agency personnel.[5]

■ That, however, is not the premise of Rule 3740, for the rule does not purport to serve departmental needs. The object of the rule is to correct "underutilization" of members of "protected groups," defined as women or members of ethnic minorities, irrespective of any need intrinsic to the particular role and tasks of the employing agency. Whatever its merits as social policy, this objective does not comport with the Portland city charter as it stands. The purpose of the charter's merit-based hiring system is to ensure that one of the group of the *most qualified* applicants will be hired for each vacancy in the civil service, as qualifications are defined by the classifications set by the Board. The charter restricts hiring to those fittest when measured by the stated criteria; the rule allows hiring of the merely fit.

---

[5] If, for instance, the city were to sponsor a municipal theatrical or dance troupe, it presumably might need to maintain a proportion of men and women members. We decline to hold in this purely declaratory challenge to the Board's rule that there may not be valid reasons why the composition of a collective force like the police should include a proportion of members of the city's major ethnic groups aside from the needs of specific job assignments, for Rule 3740 is based on no such reason.

■ The charter does not permit the appointing authority, by continually asking for alternative lists, to work its way down the register to find a candidate it prefers for reasons irrelevant to the job's requirements. Such a practice would make the plan a charade. As we view the charter system, the appointing authority can only request a second list *if* the three certified candidates are unavailable, unqualified, or, for some job-related reason, unacceptable. It is implicit in the charter that if an alternative list is requested, this second certified list must be comprised of the three highest remaining candidates on the register. The Board may not, given such a request, go down the register and certify candidates for reasons other than merit, as defined by their examination scores.[6]

■ However laudatory and salutary be the goal underlying the rule adopted by the Board, it is in conflict with the charter and beyond the Board's delegated powers to promulgate and implement. In sum, unless the Board validly finds that sex or minority status are job-related characteristics in the composition of particular groups of agency

---

[6] This is not to say that candidates qualified by reason of their test results cannot be passed over for legitimate job-related reasons, nor is this holding intended to bar so-called "selective certification." If, for example, the police bureau has a legitimate need for an officer who speaks Spanish or for a woman officer to work on a rape crisis team, it may be consistent with the charter for the Board to selectively certify a list of the three highest standing candidates having this particular attribute; or to revise the competitive examination. Charter section 4-106 (a partial text of which is set forth above in footnote 2) provides for "* * * tests of health and physical qualifications and of manual, clerical or professional skill. * * *"; or to revise the job classification under charter section 4-104 (see footnote 1). The validity of Board Rule 3730, titled "Selective Certification," is not before us. It provides:

"The appointing authority may request, in writing, that selective certification be authorized. Such authorization will be made only on the basis that a position to be filled requires specialized knowledge and skill which cannot be acquired through a brief period of on-the-job training. The request must be approved by the Board. Following approval, the Board will either announce and conduct the examination to provide for selective certification, or if an eligible register exists, the Board will review the register to determine which eligibles possess the requisite knowledges and skills. When names of eligibles are certified on a selective basis at the request of the appointing authority, the Board shall pass over the eligibles who do not possess the knowledges and skills necessary for that specific position.

"Selective certification will not be authorized on the basis of employment or experience in a specific bureau or department; but will be authorized only on the basis of specific knowledges and skills necessary to perform the assigned duties."

personnel, a rule which invites agencies to depart from the sequence of scores on the designated examination is in conflict with the charter. Unless the charter is amended or departure from its terms is mandated by overriding state or federal law, Rule 3470 cannot legally be put into effect. We therefore turn to the second issue, whether the Board has the power to implement, by rule, a city affirmative action program which is believed to be necessary to bring the city into compliance with federal, state and local equal opportunity laws and regulations.

## II

The Board and the *amici* argue that, if the rule is in conflict with the charter, overriding federal, state, and local affirmative action and anti-discrimination policies preempt the conflicting charter provisions.[7] They urge that strict compliance with the charter's "rule of three" should not be required by this court where to do so would be to bar this voluntary affirmative action program and subject the city to inevitable discrimination lawsuits, court-imposed affirmative action, and potential monetary liabilities.

The Board and *amici* contend that the Board can voluntarily adopt an affirmative action plan which conflicts with the charter without a prior adjudication of past or present discriminatory practices if the Board determines that such a program is necessary both to rectify racial and sexual imbalance in the city's civil service and to avoid potential lawsuits and civil liability. They cite recent cases from other jurisdictions in which voluntary affirmative action programs, adopted by public employers, were upheld against challenges based on "reverse discrimination" and merit-hiring conflict grounds.

The Board relies upon the recent Pennsylvania Supreme Court case of *Chmill v. City of Pittsburgh*, 488 Pa

---

[7] The Board and *amici* cite, *inter alia*, the following authorities in support of their preemption argument: U.S. Const., XIV Amend.; Oregon Const., Art. I, § 20; Title VII of the Civil Rights Act of 1964, as amended, 42 USC §§ 2000e, *et seq.*; ORS 659.010 *et seq.*; 28 CFR § 50.4 (1979); 29 CFR § 1604-1608, (1979); 31 CFR § 51, (1979); 41 CFR § 60-3 (1979); Executive Order 11246; and Revised Order 4, Office of Federal Contract Compliance Programs, United States Department of Labor; Portland City Ordinance No. 144724.

470, 412 A2d 860 (1980).[8] In *Chmill,* the court upheld a dual-list affirmative action plan, similar to the one here, adopted by the City of Pittsburgh Civil Service Commission. The challengers, disappointed white male applicants for firefighter positions, contended that the certification of the second list, composed of lower-scoring minority applicants, was invalid as "reverse discrimination" and contrary to the Pennsylvania civil service statute which set up a strict merit-based hiring system. With regard to the latter issue, the majority of the court, in reasoning very similar to that adopted by the Court of Appeals in this case, held that that incidental statutory conflict was outweighed by the public purpose served by the affirmative action plan adopted. 412 A2d at 874-875. First, the majority held that the policy behind the civil service act—"to alleviate the problem of patronage hiring and promotion in public employment"—was not compromised by the dual-list scheme. Second, they noted that all candidates who passed the examination were "equally qualified" for the jobs despite the disparity in test scores.[9] Third, they concluded that a clause in the civil service act allowing the employer to pass over the certified applicants for "just cause in writing" was sufficient authority to validate the alternative list. Finally, and most significantly, the court relied upon the fact that the city had been found guilty in a prior federal case of past and present discriminatory hiring practices and had been ordered to remedy the situation forthwith.[10] The court then held:

"* * * Our careful review of the legislative history of this section of the Civil Service Act convinces us beyond

---

[8] This case is noted in Recent Developments, Civil Rights—Public Employer May Voluntarily Adopt an Affirmative Action Program to Remedy Judicially Determined Racial Discrimination, 26 Vill L Rev 167 (Nov 1980).

[9] Specifically, the court noted:

"The trial court's findings of fact, supported by uncontradicted substantial evidence, are that all of the candidates who passed the Commission's 1975 examination were equally qualified for jobs as firefighters. * * * Because of these findings *we need not decide* what discretion the Commission might have had to certify minority applicants who were less qualified than appellees." 412 A2d at 874-875. (Emphasis added.)

[10] Regarding the third point, by reference to the "just cause" clause in the statute to justify the certification of the second list, the court seemed to imply that compliance with a federal court's remedial order gave rise to sufficient "just cause" to allow the hiring authority to request the second list. 412 A2d at 875. Such an order does not exist in this case.

any doubt that the Legislature did not intend to foreclose the Commission from taking action to remedy past and existing discrimination in the Pittsburgh Bureau of Fire." 412 A2d at 874.

Justice Larsen dissented, saying:

"The overriding question to be asked here is whether this Court is going to permit a Commission established by the legislature to 'enact' rules contrary to those established by the legislature. If the Commission felt that a quota system was required to right past discriminatory wrongs, it would have been appropriate for the Commission to go back to Federal Court and seek a judicial determination based upon a record developed in open court. * * * Of course, the Commission could have alternatively sought legislative changes which would have permitted the creation of the two certified lists.

"Here, the Commission took neither of the above available courses of action and, instead, disregarded the very Act of the legislature under which it was created. * * * Nowhere in [the Act's legislative] history is there any indication that the legislature sought to control every evil faced by society. And, clearly, the Commission itself was not given any authority in the Act to remedy all of society's ills on its own." 412 A2d at 879.

It is clear that there is a fundamental distinction between *Chmill* and the case at bar—viz., the presence in *Chmill* of a prior judicial determination of discriminatory hiring practices. The *Chmill* court noted this when it framed the issue of that case:

"This case presents the question of whether a municipal employer *which has been found guilty of racial discrimination* by a federal court may institute temporary remedial race-conscious hiring." 412 A2d at 862. (Emphasis added.)

In *Lindsay v. City of Seattle,* 86 Wash 2d 698, 548 P2d 320, *cert den* 429 US 886 (1976),[11] the court upheld a voluntarily implemented affirmative action program despite a direct conflict with City of Seattle charter provisions relating to merit hiring, holding that any conflict "is excused because of the overriding provisions of Title VII of the Civil Rights Act of 1964." 548 P2d at 327. Although

---

[11] The holding of this case was recently affirmed and elaborated upon in *Maehren v. City of Seattle,* 92 Wash 2d 480, 599 P2d 1255 (1979), *cert. denied,* ____ US ____, 101 S Ct 3079 (1981).

there was no prior judicial finding of discriminatory hiring practices, the Civil Service Commission, faced with formal charges of Title VII violations filed by the Equal Employment Opportunity Commission, had adopted a resolution admitting that its employment tests and procedures had had a discriminatory effect. The factual basis of this resolution was stipulated to by the parties to the action and the court held that this evidence, consisting of statistical information of gross minority under-representation in the city's civil service, was sufficient to establish a prima facie case of discrimination under Title VII. 548 P2d at 324-325. Thus, *Lindsay,* like *Chmill,* dealt with a civil service system judicially determined to be operating in violation of federal anti-discrimination law. In both cases the courts concluded that the overriding need to remedy the federal law violations justified the waiver of strict compliance with the civil service system's merit-hiring scheme.

■ Most of the cases cited by the Board involve either employers who had been found in violation of federal or state anti-discrimination laws in their hiring practices, or voluntary affirmative action plans which were attacked on "reverse discrimination" grounds alone.[12] We have found

---

[12] *See, e.g., United States v. City of Miami, Fla.,* 614 F2d 1322, *rehearing granted* 625 F2d 1310 (5th Cir 1980) (consent decree mandating affirmative action); *Zaslawsky v. Brd. of Ed. of Los Angeles Unified Sch. Dist.,* 610 F2d 661 (9th Cir 1979) (voluntary affirmative action program upheld against "reverse discrimination" challenge despite lack of adjudication of past discrimination — no statutory, charter, or contractual conflict evident); *Detroit Police Officers' Ass'n. v. Young,* 608 F2d 671 (6th Cir 1979) *cert denied* ____ US ____, 101 S Ct 3079 (1981) (finding of past discrimination, no charter or statutory conflict); *Baker v. City of Detroit,* 483 F Supp 930 (ED Mich 1979) (past *de facto* discrimination found, no charter/statute conflict); *Doores v. McNamara,* 476 F Supp 987 (WD Mo 1979) (voluntary affirmative action program upheld despite lack of discrimination adjudication—no charter/statute conflict); *Price v. Civil Service Comm'n of Sacramento Cty.,* 26 Cal 3d 257, 161 Cal Rptr 475, 604 P2d 1365, *cert dismissed as moot,* 449 US 811, 101 S Ct 57 (1980) (see fn 15, *infra*). *Compare Rand v. Civil Service Comm'n,* 71 Mich App 583, 248 NW2d 624 (1976) (where no Title VII violation shown, commission not free to disregard civil service rules in affirmative action hiring.

For similar reasons, the recent Supreme Court decisions of *United Steelworkers v. Weber,* 443 US 193, 99 S Ct 2721, 61 L Ed 2d 480 (1979), and *Regents of the U. of Calif. v. Baake,* 438 US 265, 98 S Ct 2733, 57 L Ed 2d 750 (1978), are not directly applicable here. Those cases dealt with "reverse discrimination" challenges to voluntarily implemented affirmative action programs. Neither case involved any attack upon the underlying legal authority of the entity adopting the plan.

no case in which a civil service commission was allowed to adopt and implement an affirmative action plan contrary to an organic act or city charter in the absence of an adjudication of past or present discriminatory hiring practices. Even so, we cannot say that Rule 3740 is invalid *on its face,* even though it is inconsistent with the charter. In November, 1977, the Portland City Council adopted a comprehensive ordinance designed to comply with existing state and federal law[13] by increasing the "utilization of minorities and women in all levels and all classifications of the City's work force." Each city office was required to establish goals and timetables to achieve full utilization of women and minorities "based on a factual assessment of the number of women and minorities available in the work force who can be expected to possess the skills required to perform the job." Before any person can be placed in a classified position pursuant to Rule 3740 there must be a showing, by the department requesting affirmative action certifications in entry level classifications, as follows:

"(a)  Identification of the protected group (minorities, a class of minorities, or women) to which the request applies.

"(b)  A documented showing that past recruitment, examination and appointment practices have resulted in an underutilization of the protected group in the specific job category within the initiating department, office or bureau.

"(c)  A statement explaining the compelling interest of the department, office or bureau in achieving a balance between members of the protected group in its workforce and those in the relevant labor force."

We read the rule to require a showing similar to the showing made in *Chmill, supra,* or in *Lindsay, supra.* The burden imposed by Rule 3740 is substantial. The second element requires (1) a documented showing (2) that past practices have resulted in an underutilization of the protected group (3) in the specific job category of the requesting agency. "Underutilization" is defined in the

---

[13] Section 3.100.011(c) of the ordinance refers to "* * * the Civil Rights Act of 1964 (Title VII) and as amended in 1972, the Age Discrimination Act of 1967, the Equal Pay Act of 1963, the Rehabilitation Act of 1973, Revised Order No. 4 of Executive Order 11246, Sections 60-2.10 through 60-2.32, and the Enforcement of Civil Rights and Fraudulent Employment Practices, Chapter 659, of the Oregon Revised Statutes."

city's affirmative action ordinance as "* * * employing fewer minorities or women in a particular job category than would reasonably be expected by their presence in the relevant labor market."

Even though Rule 3740 is inconsistent with the charter, we cannot say, on the meager record before us,[14] that the rule is invalid. The validity of Rule 3740, *in its application*, is not before us, and must await the case in which a city department or bureau seeks to invoke its provisions. In such a case the sufficiency of the showing by the appointing authority can be challenged. A local governmental body need not await suit in order to comply in good faith with existing law.[15] Moreover, it has been held that the United States Constitution may require local governments to eliminate the effects of past discrimination. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 US 1, 15, 91 S Ct 1267, 28 L Ed 2d 554 (1971).

We emphasize the narrowness of our holding. The application of Rule 3740 to a specific case involving the placement of specific persons must await further developments. We do not invalidate Rule 3740 in this proceeding.

Affirmed.

---

[14] The entire record in the trial court consisted of a complaint, answer, one exhibit, briefs, opinion and judgment. There is no transcript of the proceedings.

[15] In this respect, *compare Price v. Civil Service Comm'n of Sacramento Cty., supra* n 12. In *Price* a voluntarily imposed affirmative action program, adopted and implemented by the civil service commission, was upheld despite an apparent conflict with the charter. The court pointed to special charter provisions proscribing discriminatory employment practices and investing the commission with authority to enforce the provision through appropriate regulation, and held that the Commission's administrative finding, after extensive investigation and hearings of discriminatory employment practices within the system, was sufficient to justify the affirmative action program adopted. 604 P2d at 1369-1372.