Argued and submitted January 5, affirmed May 16, 2012

In the Matter of the Petition of
John Brown, Bob Cassidy, Rich Cunningham,
Joann Ernst, and Ron Farmer,
as Commissioners of the Eugene Water & Electric Board,
an Oregon municipal corporation.

For the Judicial Examination and Judgment of the Court
as to the Validity of a Contract for the Sale of Water.

John BROWN,
Bob Cassidy, Rich Cunningham,
Joann Ernst, and Ron Farmer,
as Commissioners of the Eugene Water & Electric Board,
an Oregon municipal corporation,
*Petitioners-Respondents,*

*v.*

CITY OF EUGENE,
an Oregon municipal corporation;
Friends of Eugene; LandWatch Lane County;
and Kevin Matthews,
*Intervenors-Appellants,*

*and*

Ashley MILLER
and Charles Biggs,
*Intervenors below.*

Lane County Circuit Court
161009774; A147405

279 P3d 298

Jerome Lidz argued the cause for appellants. Glen Klein filed the brief for appellant City of Eugene. Jannett Wilson and Western Environmental Law Center filed the brief for appellants Friends of Eugene, LandWatch Lane County, and Kevin Matthews. On the reply brief for appellant City of Eugene were Jerome Lidz and Glenn Klein.

Joel S. DeVore argued the cause for respondents. With him on the brief were Luvaas Cobb and Eric S. DeFreest.

Before Ortega, Presiding Judge, and Hadlock, Judge, and Edmonds, Senior Judge.

HADLOCK, J.

## HADLOCK, J.

This case arose when the Eugene Water and Electric Board (EWEB) sought judicial validation of a contract under which it agreed to sell water to the City of Veneta. Other interested parties intervened in that validation proceeding, including the City of Eugene. Intervenors argued that EWEB lacked authority to enter into the contract because, under the Eugene Charter, "extension of water service" is subject to control by the Eugene City Council, which has not approved the sale at issue. The trial court entered a judgment validating the contract. Intervenors appeal, renewing the argument that the water sale described in the contract constitutes an "extension of water service" and, accordingly, requires the city council's approval. We affirm.

The facts are neither disputed nor extensive. EWEB and the City of Veneta entered into the contract in question in April 2010. The contract requires the City of Veneta to purchase "an estimated 150 million gallons per year to serve its customers." It characterizes the water to be sold as "surplus water" and the sale as "wholesale," and it specifies that EWEB will not directly provide service to customers in Veneta. The contract identifies a "point of delivery" just inside the Eugene city limits; it contemplates that EWEB will construct a transmission line from its existing water system to that point and that the City of Veneta will construct a line from there to its own water system. Section 3.3 of the contract provides, "Except as allowed by applicable statutes, administrative rules, and land use regulations, Veneta will not sell, allow unmetered water use (except for emergency events) or dispose of any of the Surplus Water purchased under this agreement outside of its Direct Service Territory."

EWEB is not required to perform its contractual obligations until it obtains validation of the contract. ORS 33.710(2) provides that a governing body "may commence a proceeding in the circuit court * * * for the purpose of having a judicial examination and judgment of the court as to the regularity and legality of * * * [t]he authorization of any contract and as to the validity of the contract * * *." Accordingly, EWEB petitioned for validation of the contract under that

statute. The trial court granted motions to intervene by the City of Eugene and by the LandWatch intervenors.[1]

All intervenors moved for summary judgment, arguing that the proposed sale would violate the Eugene Charter and the Eugene Code. In essence, intervenors argued that both sources of authority provide that the decision to approve the sale of water rests with the city council, not with EWEB. EWEB also moved for summary judgment, arguing that the Eugene Charter grants it full authority over the water utility, subject only to the city council's control over "extension of water service," which, according to EWEB, does not include wholesale sales like the one at issue in this case.

The trial court agreed with EWEB. It denied intervenors' summary judgment motions, granted EWEB's, and entered a judgment validating the contract.

On appeal, the parties renew their arguments regarding the extent to which the Eugene Charter reserves to the city council authority over water sales.[2] The parties' dispute centers on section 44(3) of the charter, which states:

"The board [EWEB] shall maintain and operate the water utility and the electric utility of the city, subject to control by the council of extension of water service."

EWEB contends that "water service" refers only to EWEB's direct provision of water to the ultimate users. Because the contract states that EWEB will sell water wholesale to the City of Veneta, which will in turn distribute the water to end

---

[1] LandWatch Lane County, Friends of Eugene, and three individuals moved as a group to intervene. The two organizations and one of the individuals have appealed. For convenience, we refer to them collectively as "the LandWatch intervenors."

[2] In their brief, the LandWatch intervenors also argue that the Eugene Code requires city approval of the water sale. The code provision that they rely on provides in part that neither the city nor EWEB shall "provide water, water service or sewer service outside the city limits except as authorized pursuant to the city charter, this code, and adopted resolutions." Eugene Code 2.212. Because the city code itself references authorization under the Eugene Charter, the viability of the LandWatch intervenors' code argument still depends entirely on whether the charter reserves to the city council authority to approve the sale. Accordingly, our decision about the charter also disposes of the argument under the city code, so we do not address that argument separately.

users through its own system, EWEB contends that the contract does not call for an "extension of water service" by EWEB and therefore does not require the city council's approval.

In their responses, intervenors frame their arguments slightly differently. The City of Eugene appears to accept EWEB's assertion that "service" is limited to service provided by EWEB, but it contends that delivery of water wholesale to another distributor constitutes "water service." In its view, the City of Veneta is just another customer to which EWEB would provide water service, albeit at the wholesale level. As we understand the LandWatch intervenors' argument, their view is that an "extension of water service" includes any provision of water from EWEB's water system to new users, regardless of what entity actually distributes the water to the users. The arguments do not differ fundamentally; they both depend on the notion that the term "water service" is broad enough to encompass the wholesale provision of water to another entity, regardless of what entity distributes that water to end users.

The parties' arguments turn on the meaning of Eugene Charter section 44(3), which was referred to the voters of Eugene by the city council and adopted in 1976. "A city's charter is, in effect, the city constitution." *Portland Police Assn v. Civil Service Board*, 292 Or 433, 440, 639 P2d 619 (1982). We interpret city charter provisions "by the same means as other legislation, including attention to the meaning intended by those who adopted it if that can be ascertained." *DeFazio v. WPPSS*, 296 Or 550, 569, 679 P2d 1316 (1984). Because the charter provision was adopted by the voters, "[o]ur task is to discern what the voters intended * * *, which we derive by first looking to the text and context of the provision, taking into account any history of the measure that illuminates the voters' intent." *Burke v. DLCD*, 241 Or App 658, 665, 251 P3d 796, *rev allowed*, 350 Or 532 (2011) (applying those principles to construction of a statute enacted by legislative referral); *see also Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 56-57, 11 P3d 228 (2000) (applying the same principles to a constitutional amendment enacted by referendum); *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559 n 7, 871 P2d 106 (1994) (noting that

"caution is required in ending the analysis before considering the history of an initiated constitutional provision").

As noted earlier, section 44(3) of the Eugene Charter states:

> "The board shall maintain and operate the water utility and the electric utility of the city, subject to control by the council of extension of water service."

The provision begins by granting EWEB complete authority to "maintain and operate the water utility * * * of the city," but it then carves out a portion of that authority—control over the extension of water service—and gives it to the city council. Accordingly, control of wholesale water sales lies with EWEB unless those sales constitute "extension of water service," a phrase that the charter does not define. The parties do not dispute the meaning of "extension"—all agree that it means enlargement or expansion—rather, their disagreement centers on the meaning of "water service."

Although we often turn to the dictionary when attempting to discern the ordinary meaning of terms in statutes and other laws, the dictionary provides little help in this case, as it includes definitions of "service" that lend at least some support to both parties' arguments. As the city contends, delivering water to a particular point, from which it will be taken and distributed by another utility, could be understood to be providing a "service"—that is, wholesale "water service." *See Webster's Third New Int'l Dictionary* 2075 (unabridged ed 1976) (defining "service" to mean, among other things, "action or use that furthers some end or purpose : conduct or performance that assists or benefits someone or something"). "Water service" also can be read more narrowly, as EWEB argues, to mean only provision of water directly to users. *See id.* (also defining "service" to mean "a pipe branching from a gas or water main to serve the premises of a user"); *cf. id.* at 2076 (defining "service pipe" as "a pipe connecting a main pipe (as a gas or water mail or an electrical conduit) with a building"). Yet another definition of "service" could be used as support for either party's view; "the provision, organization, or apparatus for conducting a public utility or meeting a general demand," *id.* at 2075, can be understood as referring either to (a) the provision of water

wholesale, meeting the general demand of the public at an early point in the process, or (b) the provision of water to many individual users, meeting the "general demand" by satisfying individual users' needs.

Instead of picking from those dictionary definitions, we find it more helpful to consider, from a practical standpoint, what the voters would have understood the term "water service" to mean when they voted on the charter in 1976. Viewed from that perspective, we believe that EWEB's interpretation of "water service"—the direct provision of water to end users—is more plausible. Voters, who for the most part were end consumers of water, would have understood that EWEB was the entity that provided them with "water service." To them, the term "water service" would have connoted the provision of water to the end user. We think it unlikely that voters would have understood the term also to encompass the wholesale transfer of water from one utility or entity to another.

The city's interpretation also seems strained when the charter provision's text is compared to what the city says that text means. The city repeatedly equates the charter phrase "extension of water service" with any "sale of water" outside of the City of Eugene. If that is all the phrase meant, section 44(3) could have stated simply that EWEB "shall maintain and operate the water utility * * * subject to control by the council of the sale of water outside the city limits." But the term "water service" suggests a more technical, precise meaning than do the words "sale of water," and the city's interpretation deprives "water service" of that more technical character. As noted above, we believe that voters who were, themselves, beneficiaries of EWEB's water service, would not have read "water service" so broadly that it would include wholesale water sales to other entities.

We acknowledge, however, that consideration of the charter's text, standing alone, does not provide a certain answer regarding the meaning of "extension of water service." Accordingly, we look to the charter provision's context in an effort to discern the voters' intent. In construing other voter-enacted laws, Oregon courts have considered as context "any relevant statutory framework in effect at the time that

the voters adopted the provision." *Li v. State of Oregon*, 338 Or 376, 388-89, 110 P3d 91 (2005) (voter-initiated constitutional provision); *see Friends of Yamhill County v. Board of Commissioners*, 351 Or 219, 240, 264 P3d 1265 (2011) (context of referred statute includes "statutory framework within which the law was enacted"); *English v. Multnomah County*, 229 Or App 15, 32, 209 P3d 831, *adh'd to as modified on recons*, 230 Or App 125, 213 P3d 1265 (2009), *rev dismissed*, 348 Or 670 (2010) (context of voter-initiated statute includes other related statutes). Applying that methodology here, we have reviewed the pertinent statutory framework that existed at the time of the charter vote, and we have found one statute that sheds some light on the question of what the voters would have intended.

In 1969, the legislature created three local government boundary commissions, including one with jurisdiction over Lane County. Or Laws 1969, ch 494, § 4; *former* ORS 199.425 (1969), *repealed by* Or Laws 2007, ch 239, § 315. The legislature's stated purpose in creating those commissions was "to provide a method for guiding the creation and growth of cities and special service districts in Oregon"—including domestic water supply districts—"to prevent illogical extensions of local government boundaries and to assure adequate quality and quantity of public services * * *." ORS 199.410(2) (1975). Under ORS 199.464 (1975), the boundary commissions' functions included approving establishment of new community water supply systems and extensions of water lines by existing systems, including city-owned systems like EWEB's. In that context, the legislature used the word "service" in two ways that enforce our preliminary understanding of the term "water service." First, the legislature set forth procedures related to the allocation of "service territory" for community water supply systems—*i.e.*, the geographic region within which a particular water supply system would provide water to residents and other consumers. ORS 199.464(5)(a), (d) (1975). Second, the legislature included the word "service" in its definition of "water line," which excluded certain water lines going to "premises of the water user *unless the line provide[d] for extraterritorial extension of service*." ORS 199.464(7) (1975) (emphasis added). That definition used the word "service" in relation to providing water to

users, suggesting that "extension of service" would refer to providing water to other users—that is, new retail customers. Both of those statutory references to "service" seem to reflect a general understanding that providing "water service" would mean, at least in this context, providing water to individuals and entities that actually use it. Thus, ORS 199.464 (1975) provides context supporting our view that the voters likely would have understood "extension of water service" to refer to providing water directly to users, not to providing wholesale water to other utilities or municipalities.

Admittedly, we have found no additional contextual clues supporting that conclusion.[3] However, nothing in the context suggests the voters had the different understanding of "extension of water service" that the City of Eugene advocates.

Nor does the charter's enactment history prompt us to adopt the city's broad interpretation of "extension of water service." That history includes a statement in a voters' guide explaining that, under the charter, the "City Council will control the extension of water service as an essential tool in land use planning and the control of urban sprawl." The city argues that interpreting section 44(3) to exclude wholesale water sales from the city council's control would substantially undermine the council's ability to achieve those objectives. For example, the city contends, EWEB's interpretation would allow a developer to build a subdivision just outside Eugene's urban growth boundary, create a private water supply system, and have the private water company contract with EWEB for wholesale water, thereby circumventing the city council's ability to control sprawl. We recognize that our adoption of EWEB's interpretation might leave the city council with a less-effective planning and sprawl-controlling tool than it otherwise would have. But intervenors' and EWEB's

---

[3] EWEB cites as contextual evidence sources indicating that "water service" is a term of trade usage with a meaning consistent with EWEB's position. EWEB's reliance on those sources is problematic for two reasons. First, nothing in the record suggests that the Eugene voters were aware of that trade usage when they enacted the charter. Second, the sources on which EWEB relies may not even have existed in 1976, when the charter vote took place. For example, EWEB cites the definition of "service" in an industry dictionary published in 2010. *See The Water Dictionary* 544 (2d ed 2010). Because current sources shed little light on what the voters intended in 1976, we do not consider them.

interpretations of section 44(3) both are consistent with the objectives stated in the voters' guide, as both afford the city council *some* added measure of control over land-use planning and urban sprawl. Intervenors' interpretation might provide the city with more authority than would EWEB's, but nothing in the charter's enactment history tells us whether the voters intended the city to have that greater level of control. Consequently, we do not find the voters' guide statement particularly illuminating. Nor have we found anything else in the charter's enactment history that adds weight to either possible interpretation of "extension of water service." In short, the history does not detract from (or add support to) our conclusion based on the charter's text, read in context.[4]

To sum up, we conclude that section 44(3) of the Eugene Charter grants the city council control only over extensions of EWEB's water service to end users, not over EWEB's wholesale sale of water to other entities that, themselves, will distribute the water further. It follows that EWEB had authority to enter the contract with the City of Veneta without first obtaining approval from the Eugene City Council. The trial court did not err in validating the contract.

Affirmed.

---

[4] The City of Eugene offers, as "enactment history," minutes of a city council meeting and a memorandum provided to the council, all reflecting deliberations by the council and negotiations between city and EWEB staff members concerning section 44(3). Nothing in the record indicates that the voters were aware of any of those discussions, so they do not aid our analysis. *See Shilo Inn v. Multnomah County*, 333 Or 101, 129-30, 36 P3d 954 (2001), *adh'd to as modified on recons*, 334 Or 11, 45 P3d 107 (2002) ("[T]he history that we consider does not include early drafts of the legislative bill that later was referred to the people, nor does it include statements made by legislators in hearings on that matter. Those materials may be indicative of the *legislature's* intent in crafting [a measure] but * * * 'it is the *people's* understanding and intended meaning of the provision in question—as to which the text and context are the most important clue—that is critical to our analysis.' It follows that only those materials that were presented to the public at large help to elucidate the public's understanding of the measure and assist in our interpretation of the disputed provision." (quoting *Stranahan*, 331 Or at 57) (emphasis in *Shilo Inn*)).